**COMERICA BANK, Plaintiff/Counter Defendant,**

v.

**Charles H. MANN, III, Defendant/Counter Claimant.**

**Civil No. 1:11–CV–467–AT.**

United States District Court, N.D. Georgia, Atlanta Division.

Signed Sept. 17, 2013.

Steven D. Ginsburg, Duane Morris, LLP, Atlanta, GA, for Plaintiff/Counter Defendant.

Albert Newell Remler, Remler Tillman Law Group, P.C., Lawrenceville, GA, Grace Marie Tillman, Richard C. Wayne & Associates, P.C., Atlanta, GA, for Defendant/Counter Claimant.

### *ORDER*

AMY TOTENBER, United States District Judge.

This is a deficiency action by Plaintiff, Comerica Bank ("Comerica") against Defendant Charles H. Mann, III ("Mann") for damages based upon Plaintiff's enforcement of a written security guaranty and for related contractual attorney's fees and other expenses. The Court previously granted in part and denied in part Plaintiff's motion for summary judgment in this case, granting summary judgment as to Defendant's liability under the guaranty and denying summary judgment as to Plaintiff's claim for damages. The parties' mortgage contract required a bench trial in this case. The case was tried before the Court sitting without a jury beginning on January 14, 2013 and continuing through January 17, 2013. It is now before the Court on the parties' Proposed Findings of Fact and Conclusions of Law and Defendant's Motion for Judgment as a Matter of Law [Doc. 93].[1]

Having considered the testimony and evidence introduced, the Court makes the following findings of fact and conclusions of law.

### I. PROCEDURAL HISTORY

Comerica filed its Complaint in this case on February 16, 2011, seeking a deficiency judgment against Mann following liqui-

---

1. Defendant also filed a Motion to Strike the Testimony of James R. Mattingly [Doc. 95].

The Court addresses this motion in a separate order.

dation of collateral. (Compl.) Comerica sued Mann on a guaranty, claiming that Mann had guaranteed Yacht Ventures, Ltd.'s ("Yacht Ventures") obligations under a promissory note. (Compl. ¶ 21.)

On February 12, 2012, Comerica filed its Motion for Summary Judgment. (Mot. Summ. J.) In its Motion, Comerica argued on the basis of Georgia law that Mann owed the difference between the sale price of the collateral and the amount of Comerica's loan to Yacht Ventures. (*Id.* at 6–8.) In response, Mann pointed out that the Guaranty, under which he was being sued, clearly provided that Florida law controls, and that Comerica failed to comply with the notice and mitigation requirements of Florida law before disposing of the collateral. (Resp. Mot. Summ. J. at 7 n. 2, 11–12.) In its reply brief, Comerica implicitly acknowledged that Florida law applies here by engaging with Mann's arguments about the requirements of Florida law for disposition of collateral. (Reply Mot. Summ. J. at 3.)

On June 5, 2012, the Court entered an Order granting in part and denying in part Comerica's Motion for Summary Judgment. (Doc. 62.) The Court granted the Motion with respect to Comerica's claim that Mann is liable for default under the guaranty, but denied the Motion with respect to Comerica's claim for entry of a deficiency judgment, holding that there was a genuine question of material fact regarding whether Comerica disposed of the collateral in a commercially reasonable manner. (*Id.* at 15.)

Following an unsuccessful mediation, the Court conducted a four-day bench trial from January 14–17, 2013.

## II. GENERAL INTRODUCTION AND GOVERNING LEGAL STANDARDS

This case arises out of a $3,750,000.00 loan Comerica made to Yacht Ventures in June 2008 to refinance the purchase of an 82–foot luxury sport yacht named the Louise.[2] Yacht Ventures was a Cayman Islands company, of which Defendant Mann was the sole principal. Mann personally guaranteed the loan.

The Louise experienced a number of technical problems throughout its short life as a charter vessel for Yacht Ventures. Ultimately, unable to secure enough charter business, Yacht Ventures notified Comerica of its intention to stop making its mortgage payments. In November 2008, Yacht Ventures missed its first payment, and Comerica notified Yacht Ventures that it was accelerating the payments due on the promissory note. Comerica also wrote that it reserved the right to pursue all its remedies under the mortgage and deed of covenants.

For the next several months, Comerica arranged for the docking of the Louise at Roscioli Yachting Center in Fort Lauderdale, Florida. Following a December 2008 marine survey to determine the Louise's value, Comerica attempted to persuade the Danish manufacturer to take back or repair the Louise. The manufacturer refused to oblige.

In April 2009, Comerica liquidated a $250,000.00 Certificate of Deposit ("CD") Mann had provided to guarantee the loan to Yacht Ventures. In May 2009, Comerica notified Mann's attorney that it was electing to exercise its remedies under the mortgage and deed of covenants and that it was taking possession of the Louise. In

2. Yacht Ventures purchased the Louise in July 2007 from a Danish manufacturer, Royal Denship A/S ("Royal Denship"), as a charter vessel, initially financing the purchase through a London-based bank. Royal Denship guaranteed warranty repair work on the Louise until July 2009.

June 2009, Comerica commissioned another independent marine survey to determine the Louise's value. The June 2009 survey by Kelly Marine Surveyors, Inc. identified the value of the boat at $3,275,000.00 whereas the December 2008 survey by Patton Marine, Inc. identified the value as $4,500,000.00. Both surveys considered the costs of any technical repairs required in their assessments of value. In July 2009, Comerica executed a listing agreement with the sales arm of Roscioli to market and sell the Louise at list price for $3.5 million. In December 2010, Comerica sold the Louise for $1,400,000.00.

The parties' dispute is over whether Comerica sold the Louise in a commercially reasonable manner as required under Florida law.

### A. Choice of Law

■ "A federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir.2004); *see also Frank Briscoe Co. v. Ga. Sprinkler Co.*, 713 F.2d 1500, 1503 (11th Cir.1983). In Georgia, "parties by contract may stipulate that the laws of another jurisdiction will govern the transaction." *Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir.1998).

■ The parties stipulated in Mann's Guaranty that the Guaranty would be governed, construed, and interpreted in accordance with the laws of the State of Florida. (Guaranty ¶ 14.) However, Comerica suggests in its Proposed Find-

ings of Fact and Conclusions of Law that Cayman law applies here, because the Mortgage and Deed of Covenants states that it is to be governed and construed in accordance with the laws of the Cayman Islands.[3] (Comerica's Proposed Findings of Fact and Conclusions of Law ("Comerica's FOF") at 35; *see also* Deed of Covenants art. IV ¶ 4.) Comerica contends that the Mortgage and Deed of Covenants' choice of law provision governs here because this case is about the requirements of a sale under that document. Comerica is mistaken. The controversy in this case is over Mr. Mann's deficiency liability under the Guaranty. Comerica made this point clear in its Complaint. (Compl. at 5 (stating that the action was a suit on Mann's guarantee on behalf of Yacht Ventures).) It also took the same position—that Florida law governed—in its motion for summary judgment and pretrial order submission. (*See* Doc. 61 at 2–13 (relying exclusively on Florida law); Doc. 66 at 14–16 (citing exclusively to Florida law as providing relevant law and authority in this case).) Only at this late juncture has Comerica changed its position. (Comerica's FOF at 35–37.) As the dispute at issue arises here under the Guaranty, the Court finds that Florida law applies and Cayman law is inapplicable.

### B. Mann's Deficiency Liability

■ Under Article 9 of the Uniform Commercial Code (UCC), as codified in Fla. Stat. Ann. § 679.609(1), a secured party may take possession of collateral after a default by the debtor. The secured party may then "sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any com-

---

**3.** Comerica also mentions once in its proposed findings of fact that "[a]dmiralty law would apply the applicable law," although Comerica then states that the applicable law is Cayman law. (Comerica's FOF at 36.) The Court is thus unable to determine whether Comerica desires to apply Cayman law or federal admiralty law here.

mercially reasonable preparation or processing." Fla. Stat. Ann. § 679.610(1). "However, if the secured party wishes to preserve its right to seek a deficiency judgment, the secured party is not at liberty to dispose of the repossessed collateral in any manner it wants." *S. Developers & Earthmoving, Inc. v. Caterpillar Fin. Servs. Corp.,* 56 So.3d 56, 60 (Fla.Dist.Ct. App.2011). Instead, "[e]very aspect of [the] disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Fl. Stat. Ann. § 679.610(2). The purpose of this statutory requirement is " 'to protect the debtor, because [it] help[s] prevent the creditor from acquiring the collateral at less than its true value or unfairly understating its value so as to obtain an excessive deficiency judgment.' " *Burley v. Gelco Corp.,* 976 So.2d 97, 100 (Fla.Dist. Ct.App.5th 2008) (quoting *Allen v. Coates,* 661 So.2d 879, 884 (Fla.Dist.Ct.App.1st 1995)).

■■ In order to establish entitlement to a deficiency judgment in a certain amount, the secured party must show that its disposition of the collateral was (1) commercially reasonable and (2) resulted in the recovery of an amount less than the amount of the secured debt. *Caterpillar,* 56 So.3d at 60; *Burley,* 976 So.2d at 101. If the debtor places the commercial reasonableness of the disposition of collateral at issue, the burden falls to the secured party to establish that every aspect of the disposition was commercially reasonable. *See* Fla. Stat. Ann. § 679.626(2); *see also Caterpillar,* 56 So.3d at 60; *Weiner,* 482 So.2d at 1364–65; *Burley,* 976 So.2d at 100. The secured party's failure to dispose of the collateral in a commercially reasonable manner should not impose a burden upon the debtor to prove damages. *Weiner,* 482 So.2d at 1364. If the Court determines that "the secured party has

disposed of collateral in a commercially unreasonable manner, there will arise a presumption that the fair market value of the collateral at the time of repossession was equal to the amount of the total debt that it secured" and "the burden to prove that the fair market value of the collateral was less than the debt will be upon the secured party." *E.g., Weiner,* 482 So.2d at 1365. *See also* Fla. Stat. Ann. § 679.626(2).

■ Mann's Guaranty provides that he is liable for any deficiency arising from Comerica's election to proceed with a sale of the Louise. (Guaranty ¶ 4.) However, Mann argues in his Proposed Findings of Fact and Conclusions of Law that he is not liable for the deficiency arising from the sale in this case because (1) he was not given proper notice of disposition, and (2) Comerica's marketing and sales efforts were not reasonable, customary or generally accepted practices in the yachting sales industry, resulting in a sale of the yacht at a price well below its fair market value. Specifically, Mann claims that Comerica failed to market the Louise in the European market, for which the yacht was best suited and where it would be most valued, that it failed to market the Louise aggressively in the United States, and that it settled for a "fire sale" price for the Louise far below its fair market value. Comerica's alleged provision of deficient notice similarly provides grounds for Mann's contention of the sale's commercial unreasonableness. Mann contends that the disposition is therefore presumed to have been commercially unreasonable, and that Comerica has failed to rebut that presumption. Comerica, on the other hand, argues that it handled the notice and sale in substantive compliance with the requirements of Florida law and that in any event, any deficiency in its handling of the notice and sales process was cured by

Mann's purported consent to the sale at $1.4 million.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW [4]

### A. Purchase of the Louise

In June 2007, Defendant Mann was the sole principal of a Cayman Islands company called Yacht Ventures. (Mann Tr. Testimony at 334:12–22, 392:9–13.) Yacht Ventures maintained a registered office c/o Campbell Corporate Services Limited in the Cayman Islands. (June 30, 2008 Mortgage, Plaintiff's Ex. 2 ("Mortgage").)

In July 2007, Yacht Ventures purchased a new 2006 82–foot yacht known as the Louise ("the Louise") from the Danish manufacturer Royal Denship A/S ("Royal Denship").[5] (June 30, 2008 Deed of Covenants, Plaintiff's Ex. 2 ("Deed of Covenants") at 3; Mann Tr. Testimony at 392:25–393:1.) Yacht Ventures purchased the Louise for use as a charter vessel. (Mann Tr. Testimony at 335:11–12.) The purchase price was $4,500,00.00, discounted from the sticker price of approximately $6,300,000.00 after Yacht Ventures allowed Royal Denship to feature the Louise in a series of boat shows in Florida in order to increase Royal Denship's exposure in the North American market. (Id. at 396:17–23.) Yacht Ventures financed $3,500,000.00 of the purchase price, with a note for interest only for one year, through a London bank.[6] (Id. at 397:7–398:11–18.)

Mann took possession of the Louise in international waters off the coast of France and, after a sea trial, left the yacht in Monte Carlo for the summer, where it was chartered twice. (Id. at 329:14–23, 330:1–16.) Following its initial period of charter in Europe, Mann had the boat shipped to the United States, (id. at 330:17–25), where it was docked at the Roscioli Yachting Center in Fort Lauderdale, Florida, (Glass Tr. Testimony at 279:18–280:4). ·

Roscioli is a full service yacht repair and storage company, with between 60 and 85 employees. (Glass Tr. Testimony at 237:4–7.) It is one of a number of companies under the corporate umbrella of Ross Holding Company, a privately held company owned by the Roscioli family. (Id. at 292:2–25.) Roscioli operates two boatyards, one in Fort Lauderdale and one in Bradenton, Florida. (Id. at 237:24–238:14.) Roscioli's main business is dockage and repair. (Id. at 311:13–15.) The company generally has 60 to 100 clients at any time with vessels docked in the company's shipyards. (Id. at 237:19–21.) Roscioli also operates Waterside Yacht Sales ("Waterside"), a sales arm of the company. (Glass Tr. Testimony at 237:17–19.) Most of the vessels Waterside sells are "pleasure yachts." [7] (Id. at 238:21–23.)

Once it arrived in the United States, the Louise was entrusted to the custody, though not the ownership, of Royal Den-

---

**4.** As each of the issues in dispute here are actually questions of fact for the Court's determination based on applicable Florida law, the Court presents its Findings of Fact and Conclusions of Law together.

**5.** In his testimony, Mr. Mann stated that Yacht Ventures purchased the Louise in June 2007. (Mann. Tr. Testimony at 395:1–5.) However, the mortgage on the Louise was dated and executed on July 6, 2007 in favor of Royal Denship. (Mortgage at 3.)

**6.** Mann paid for the difference between the purchase price and the finance amount with his personal savings. (Mann Tr. Testimony at 397:10–12.)

**7.** Roscioli also manufactures and sells new vessels. (Glass Tr. Testimony at 238:25–239:2.)

ship for warranty repairs. Royal Denship had agreed to cover the Louise under warranty until July 2009. (Mann Tr. Testimony at 457:17–18.) Royal Denship also took custody of the Louise to feature it both in a series of boat shows and in the United States charter market overall, as per the company's agreement with Yacht Ventures at the time of purchase. (*Id.* at 397:22–23; Samalik Tr. Testimony at 70:10–13.)

### B. The Loan and Guaranty

Upon the yacht's arrival in the United States, Yacht Ventures executed a refinancing agreement for the Louise with Plaintiff Comerica on June 30, 2008, for the principal amount of $3,750,000.00. (June 30, 2008 Mortgage, Pl.'s Ex. 2 ("Mortgage"); Proposed Pretrial Ord. Attachment "E" ("Stip. Facts") ¶ 1; (Mann Tr. Testimony at 398:11–399:6.) As part of the refinancing agreement, Yacht Ventures provided Comerica with the following collateral: (1) a $250,000 certificate of deposit ("CD") to guarantee Royal Denship's completion of certain warranty work on the Louise;[8] and (2) the Louise. (Mann Tr. Testimony at 398:20–25; Stip. Facts ¶ 3.).) Mann also personally guaranteed Yacht Ventures' obligations under the refinancing agreement. (June 20, 2008 Guaranty, Pl.'s Ex. 3 ("Guaranty").). The Guaranty provided that it "shall be governed and construed and interpreted with [sic] the law of the State of Florida." (*Id.*)

As a condition of the refinancing agreement, Comerica required that the loan-to-value ratio equal 75 percent. (Tillman Tr. Testimony at 128:15.) Comerica therefore required that the collateral for the loan have a value of at least $5,000,000.00. (*Id.* at 128:16–19.) Comerica was satisfied that this condition was met by the value of the yacht and the $250,000 CD at the time the loan was executed. (*Id.* at 129:3–6.)

As an additional condition of refinancing, Comerica required a marine survey to determine the Louise's value. (Mann Tr. Testimony at 399:13–17.) The purpose of a marine survey, according to James Mattingly ("Mattingly"), Defendant's expert,[9] is "to establish a . . . value and . . . condition . . . for insurance purposes [and] to give a comfort factor to the purchaser." (Mattingly Tr. Testimony at 484:18–21.) A marine survey may also be used to identify needed repairs. (Glass Tr. Testimony at 242:10–18.) On May 30, 2008, a marine survey on the Louise was performed by Pliske Marine, Inc. (May 30, 2008 Survey, Joint Ex. 1 ("May 30, 2008 Survey").). The survey determined that the Louise was valued at approximately $5,000,000.00 with a replacement value of approximately $7,100,000.00. (*Id.* at 8.) The value was stated "based on the average selling price of yachts of similar type, age, and condition, considering all extras and accessories on board." (*Id.*) The survey did not include a sea trial but did address all equip-

---

**8.** When Comerica made the loan to Yacht Ventures, it was in a second lien position subordinate to Royal Denship, the manufacturer of the Louise. (Samalik Tr. Testimony at 73:17–19.) Royal Denship agreed to subordinate to Comerica and release its position but held the CD until such subordination occurred. (*Id.* at 73:19–21.)

**9.** Mr. Mattingly has over 40 years of experience in the boating industry. (Mattingly Tr. Testimony at 462:19–23.) Among his past experience, he has previously served as the vice president of sales for a company called the Allied Ferretti Company, which owns seven different yacht manufacturers. (*Id.* at 471:22–25.) He testified that he has experience surveying and valuing custom yachts and specialized in surveying yachts in the range of 50–120 feet. (*Id.* at 481:10–22.) He testified that he has performed survey work in the past for banks, law firms, and insurance companies, in addition to his work surveying and valuing boats for customers. (*Id.* at 482:7–12.)

ment on the yacht. Finally, as a condition of refinancing, Yacht Ventures promised to (a) maintain a registered office in the Cayman Islands, (b) "appoint a representative" in the Cayman Islands, (c) maintain the company's principal corporate records and books of account in the Cayman Islands or in another qualifying jurisdiction, and (d) conduct meetings of the company's directors in the Cayman Islands or another qualifying jurisdiction. (June 30, 2008 Deed of Covenants ¶ 10, Pl.'s Ex. 2 ("Deed of Covenants").)

## C. Default, Repossession, and Notice of Sale

In 2008, Mann began making inquiries into the possibility of selling a fraction of his ownership interest in the Louise to another entity. (Id. at 335:12–336:11.) On October 16, 2008, Albert Remler, co-counsel for Defendant Mann, wrote to Comerica indicating that Mann was unable to meet his loan payment obligations in connection with the purchase of the Louise. (Letter from Albert Remler to Crystal Beastrom–Diaz, Oct. 16, 2008, Pl.'s Ex. 5 ("Oct. 16, 2008 Letter").) Remler stated that Mann had been attempting both to charter and to sell the yacht but that Royal Denship had failed to complete necessary warranty work, making charter or sale impossible. (Id.) Mann testified at trial that, in October 2008, he still wanted to charter the Louise, although Mann did not make clear whether he had abandoned his intention to charter by the time Remler sent his October 16, 2008 letter. (Mann Tr. Testimony 404:16–23.)

Yacht Ventures defaulted on its loan with Comerica on or before October 2008. (Stip. Facts ¶ 5.) At the time of default,

Yacht Ventures had only made two payments to Comerica on the loan. (Mann Tr. Testimony at 441:24–25.) On November 1, 2008, Yacht Ventures failed to make an interest payment due to Comerica under the terms of the refinancing agreement. (Letter from George A. McLaughlin to Charles H. Mann, III, Nov. 14, 2008, Joint Ex. 4 ("Nov. 14, 2008 Letter").) On November 14, 2008, George A. McLaughlin ("McLaughlin"), an attorney at the law firm Tripp Scott, wrote a letter to Mann on behalf of Comerica.[10] (Id.) McLaughlin's letter stated that, due to Yacht Ventures' default, Comerica was accelerating all amounts due under the terms of the loan. (Nov. 14, 2008 Letter.) The letter continued as follows:

> If you fail to satisfy such demand by 5:00 p.m. on November 21, 2008, then the Bank will commence an action to collect the amount due on the Note, and may at the Bank's sole discretion, exercise any or all of its remedies under the Note and the related Loan Documents. These remedies include the take [sic] possession of the Vessel or have [sic] a U.S. Marshall arrest the Vessel and commence [sic] a foreclose [sic] action on the Vessel secured by the Mortgage. The Bank may also commence an action against the guarantor, Charles H. Mann, III, personally, for payment of the amount due under the Note.

(Id.)

According to Mann, Comerica "had primary involvement and interest [in the Louise]" as of November 2008. (Mann Tr. Testimony at 434:5–7; see also id. ("We told them we were not going to be able to continue to make payments in November [2008].").) However, Yacht Ventures con-

---

**10.** McLaughlin addressed the letter to Yacht Ventures in the Cayman Islands. Mann testified that a Cayman Islands law firm named Campbells, Yacht Ventures' registered agent in the Cayman Islands, likely forwarded him the letter. (Mann Tr. Testimony at 429:12–20.)

tinued to pay the insurance on the Louise through June 2009 as a demonstration of "good faith" during negotiations with Comerica over Yacht Ventures' liability. (*Id.* at 440:21–441:6.) Comerica paid the remaining insurance on the Louise through the date of sale in December 2010 for a total of $103,000.00.[11] (Samalik Tr. Testimony 112:18–116:12; Pl.'s Ex. 7.)

Comerica kept the Louise docked at Roscioli, and paid Roscioli for the cost of dockage, during and after November 2008. (Stip. Facts ¶ 8; Samalik Tr. Testimony at 74:9–16.) In exchange, and based on its previous business relationship with Comerica, Roscioli lowered its dockage fee for the Louise, at Comerica's request, from $1.75 per foot per day to $1.00 per foot per day. (*Id.* at 310:5–21; *see also id.* at 251:23–252:2.) Comerica also employed Roscioli to perform regular maintenance and repairs on the Louise while it was docked at Roscioli's Fort Lauderdale shipyard. (Stip. Facts ¶¶ 12–13, 19.) The Louise remained at Roscioli until it was sold. (Glass Tr. Testimony at 312:18–23; Samalik Tr. Testimony at 96:22–98:20.)

Mann testified that he received no communication from Comerica regarding the Louise between November 2008 and May 2009. (Mann Tr. Testimony at 411:3–7.) He stated that he had "no way of knowing" what would happen to the Louise after he received Comerica's November 14, 2008 letter. (Mann Tr. Testimony at 407:7.) Mann testified that he became aware at some point in 2009 or 2010 that a yacht broker named Waterside was marketing the Louise, but that no one from Comerica actually notified him that the bank had hired Waterside, informed him of any offers being made for the boat through the broker, or provided him with a listing

agreement for the Louise. (*Id.* at 411:16–412:16.) He testified that he received monthly interest statements from Comerica detailing the amount due and owing on the Louise through the date on which the yacht was sold. (*Id.* at 441:10–14.) He also testified that he saw "one or two ads" for the Louise placed in the *Wall Street Journal* and knew Comerica was trying to sell the yacht. (*Id.* at 445:19–24.)

In November 2008, Comerica learned from Mann's counsel of several items on the Louise in need of repair. (Samalik Tr. Testimony at 58:1–8.) As a result, in December 2008, Comerica commissioned a second marine survey "to assess the exact nature of the issues with the yacht to get a[n] update on it because we had one party saying it was perfectly able to run, another party saying it can't run." (*Id.* at 63:7–11.) The survey included a sea trial, which the Louise failed. (*Id.* at 63:12–13; 66:19–20.) The survey also resulted in the production of 36 pages of reported maintenance and repair issues with the Louise. (*Id.* at 63:14–17.) The survey concluded that the value of the Louise was $4,500,000.00. (Stip. Facts ¶ 11.) This value assessment included the costs of repair. (Dec. 17, 2008 Survey, Joint Ex. 2 ("Dec. 2008 Survey") at 36.)

Following the December 2008 survey, Comerica attempted to persuade Royal Denship to take back or repair the Louise. (Samalik Tr. Testimony at 67:25–68:3.) According to Rosalyn Samalik, a vice president at Comerica currently working in Comerica's Special Assets Group and Comerica's loan officer for the Yacht Ventures loan, Comerica could not determine whether Royal Denship or Mann was at fault for the maintenance issues on the Louise but "wanted to work through the warranty

11. Comerica applied a credit of $29,862.00 for the "duty refund" toward Mann's liability on the insurance payments, resulting in a total liability for insurance and taxes of $73,846.99. (Samalik Tr. Testimony 112:18–116:12; Pl.'s Ex. 8.)

process to see if we could get the yacht fixed." (*Id.* at 26:21–25, 68:1–3; *see also* Mann Tr. Testimony at 456:22–457:2 (testifying that Comerica "initially indicated a willingness to cooperate to the point where Royal Denship offered to take the boat back to Europe, fix it, and sell it there or bring it back here").) Comerica persisted in its attempts to convince Royal Denship to perform warranty work on the Louise from November 2008 to May 2009. (*Id.* at 70:5–11.) However, Royal Denship never performed the requested warranty work. (Mann Tr. Testimony at 432:20–24.)

In February 2009, Mann's attorney wrote to inform Comerica that Royal Denship did not intend to honor its repair warranty. (Samalik Tr. Testimony at 109:8–10; Letter from Albert Remler to Gregory A. McLaughlin, Feb. 24, 2009, Pl.'s Ex. 34 ("Feb. 24, 2009 Letter").) In February 2009, Mann's attorney wrote in a separate letter to Comerica that repair work on the Louise would cost approximately $750,000. (Mann Tr. Testimony at 326:21–25.) Mann's attorney wrote that Mann could no longer afford the cost of the yacht. (*Id.* at 327:1–4.) Mann's attorney therefore offered to "give the yacht back to Comerica" at that time. (*Id.* at 327:10–12.)

On April 6, 2009, Comerica liquidated the $250,000.00 CD Mann had provided to guarantee the performance of outstanding warranty work. (Stip. Facts ¶ 21.) According to Samalik, Comerica only realized in February 2009 that Yacht Ventures would not satisfy its debt. (Samalik Tr. Testimony at 120:20–24.) Samalik testified that Comerica will generally liquidate collateral in the event of default. (*Id.*) However, Samalik testified that Comerica waited until April 2009 to liquidate the CD because the CD did not mature until that month. (*Id.* at 120:23–121:1.) She testified that had Comerica liquidated the CD earlier, the bank would have been liable for penalties. (*Id.* at 121:2–4.)

Also in April 2009, Comerica became aware that Royal Denship had filed for bankruptcy and was out of business.[12] (Samalik Tr. Testimony at 68:4–5.) As a result, Comerica decided to attempt to sell the yacht to an outside buyer. (*Id.* at 77:7–9.) On May 21, 2009, McLaughlin sent a second letter to Yacht Ventures and to Mann on behalf of Comerica. (Letter from George A. McLaughlin to Yacht Ventures et al., May 21, 2009, Joint Ex. 6 ("May 21, 2009 Letter").) The letter purported to be in relation to a "Promissory Note ... dated June 30, 2008 in the original amount of $3,750,000 executed and delivered by Yacht Ventures, Ltd. .... in favor of Comerica Bank ...; M/V Louise—82 Open Royal Denship." (*Id.*) In his letter, McLaughlin wrote that Comerica was "electing to exercise its remedies under the Loan Documents and will be taking possession of the Vessel as permitted by ... the Deed of Covenants." (*Id.*) The letter also stated that "the Bank is entitled to collect all of its expenses associated with the exercise of its remedies, including, without limitation, maintaining and insuring the Vessel during the period of Bank's possession, and all expenses related to a sale of the Vessel." (*Id.*)

Unlike the November 14, 2008 Letter, McLaughlin's May 21, 2009 letter stated that Comerica was electing to exercise its remedies under the Deed of Covenants. For example, the May 21, 2009 letter stated that Comerica would be taking possession of the Louise; by contrast, the November 14, 2008 letter stated only that Comerica was reserving the right to exer-

---

12. Although Royal Denship went into bankruptcy, no evidence was presented that it actually went completely out of business rather than being restructured.

cise its remedies under the Deed of Covenants, including the right to take possession of the Louise. (*Compare* May 21, 2009 Letter *with* November 14, 2008 Letter.)

As a matter of fact, the evidence in this case indicates that Comerica took possession of the Louise on May 21, 2009 and of the $250,000.00 CD on April 6, 2009. From May of 2009 to December of 2010, Comerica invested roughly $500,000 in repairs, dockage fees, and insurance costs. (Samalik Tr. Testimony at 95:25–96:5.) Although Comerica paid several invoices for the Louise's dockage and repair beginning in November 2008, these payments were made in accordance with Comerica's rights as Mortgagee under the Deed of Covenants. (Deed of Covenants ¶ 24 ("If the Owner fails to [maintain the Vessel in good condition], the Mortgagee may, but is not obligated to, effect maintenance of and repairs to the Vessel.").) Comerica thus did not have to take possession of the Louise in order to pay for its dockage and repairs. The Louise remained at the Roscioli boatyard both before and after May 21, 2009.

Moreover, Mann's testimony suggests that Comerica's payment for dockage and repairs was not indicative of possession. For example, Mann testified that, on February 2, 2009, Yacht Ventures was "offering" to give the Louise back to Comerica. (Mann Tr. Testimony at 327:10–12.) The implication of this testimony is that, even when Comerica was making dockage and repair payments for the Louise prior to February 2, 2009, Yacht Ventures still had actual control over the Louise and therefore still had the power to "give the yacht back to Comerica." Moreover, there is no indication in the record that Comerica accepted Mann's offer and in fact took possession of the Louise from Yacht Ventures on February 2, 2009—in other words, there is no indication that the status quo as of November 2008 changed upon Comerica's receipt of Mann's February 2, 2009 letter. Indeed, the only suggestion of a change in the status quo came in April 2009 when Comerica liquidated the CD and on May 21, 2009, when McLaughlin wrote his second letter to Mann's attorney.[13]

In June 2009, Comerica commissioned another marine survey "to see what had happened to the [Louise's] repair and maintenance and had the repairs and maintenance been actually completed as was being represented to us by Royal Denship's representatives." (Samalik Tr. Testimony at 65:6–11; *see also* Kelly Marine Survey, June 27–30 2009, Joint Ex. 3

---

13. Although Comerica liquidated the $250,000.00 CD in April 2009, liquidation of the CD was not dependent on possession of the Louise. The evidence indicates that Comerica decided to liquidate the CD after realizing in February 2009 that Mann would be unable to meet his payment obligations, and waited to liquidate until April 2009 to avoid paying a penalty. (Samalik Tr. Testimony at 120:23–121:4.) However, the evidence does not confirm that Comerica elected to take possession of the Louise when it determined that Mann would not be making his payments. As of February 2009, the evidence indicates that Comerica still expected Royal Denship to make warranty repairs and perhaps even take lawful possession of the Louise. (Samalik Tr. Testimony at 70:5–11; Mann Tr. Testimony at 432:20–24.) Finally, even if Comerica realized in April 2009 that Royal Denship was bankrupt and that it would have to sell the Louise on its own, there is no evidence to suggest that Comerica took any action in April 2009 to demonstrate practical possession of the Louise beyond paying for the Louise's dockage and repairs. The Court has found such payments insufficient to demonstrate possession as a matter of fact. However, this finding does not address the propriety under Florida law (or commercial reasonableness) of Comerica's proceeding to liquidate the CD in April 2010 although it had failed in its November 2008 notice to identify the CD as an asset it intended to cash out.

("June 2009 Survey").) Comerica arranged for Roscioli to perform the repairs that they had originally hoped Royal Denship would complete under the warranty. Comerica ultimately paid Roscioli $346,692.63 to repair the Louise in preparation for its sale.[14] (Mann Invoice, Pl.'s Ex. 8 ("Mann Invoice"); Samalik Tr. Testimony at 161:16–163:24.) The June 2009 survey performed by Kelly Marine Surveyors, Inc. found the Louise to be valued at $3,250,000.00. (Stip. Facts ¶ 18.) The survey took into account "the extent of the necessary adjustments" to the Louise. (June 2009 Survey at 30.)

### D. Marketing and Sale of the Louise
#### i. The listing agreement

On July 2, 2009, Comerica executed a listing agreement for the sale of the Louise with Waterside for a "price of $3,500,000.00 or any other price acceptable to owner."[15] (Central Agency Listing Agreement, Def.'s Ex. 1 ("Listing Agreement"); see also Glass Tr. Testimony at 257:21–258:2.) This listing price was fixed based on conversations between Mr. Roscioli, Mr. Glass, and a Comerica representative. (Glass Tr. Testimony at 308:18–20.). Comerica never sent a copy of the listing agreement to Mann. (Samalik Tr. Testimony at 154:24–155:2.)

The July 2, 2009 listing agreement identified Thomas Glass as the licensed broker for the Louise. (Stip. Facts ¶ 15.) Glass, who serves as Vice President for a number of Roscioli companies, devotes only a portion of his time to his brokerage duties. (Glass Tr. Testimony at 294:14–17.) In fact, Waterside does not actually employ any full-time brokers. (Id.) For his part, Glass does "whatever it takes" for Roscioli's business to run smoothly—he testified that his primary "day-to-day activity is . . . the repair billing . . ., deal[ing] with the . . . customers . . ., [and] put[ting] men to work." (Id. at 294:10–12.) He characterized himself as "a project manager [who] collect[s] bills [and] do[es] whatever it takes to get the job done and coordinate with that." (Id. at 12–14.)

In November 2009, Roscioli hired Richard Coch as Captain of the Louise. (Stip. Facts ¶ 22; Coch Tr. Testimony at 194:23–24, 215:6–16.) Among his duties as Captain, Coch was responsible for taking prospective buyers on sea trials of the Louise. (Coch Tr. Testimony at 203:18–204:4.) Beginning in 2008, Coch also served as a part-time salesperson for Roscioli/Waterside. (Id. at 205:8–9.) Based on Coch's testimony, it appears that he, rather than Glass, was responsible for most of the legwork involved in marketing the Louise for sale. (See, e.g., Coch Tr. Testimony at 205:17–25 (describing Coch's placement of advertisements for the Louise); id. at 208:17–209:22 (describing a sea trial and other demonstrations Coch made to potential buyers).) Over the 13–month period during which Coch was involved with the Louise, he was paid for 43 weeks of work

---

14. During cross-examination of Ms. Samalik, counsel for Mr. Mann attempted to calculate the dollar total Comerica paid to Roscioli for repairs to the Louise. (Samalik Tr. Testimony at 163:16–17.) Counsel came up with a total of $346,784.45. (Id.) However, the invoice shows a total of $346,692.63. (Plaintiff's Exhibit 8.)

15. In November 2008, Comerica assigned its representative Rosalyn Samalik to manage both collection of Yacht Ventures' defaulted loan and liquidation of Yacht Ventures' collateral. (Samalik Tr. Testimony at 31:18–23.) At the time of the assignment, Samalik had experience reviewing four previous yacht surveys. (Id. at 47:19–22.) As of January 2013, the month of trial, Samalik had dealt with a total of seven different yachts as a Comerica representative. (Id. at 31:4–9.)

at a rate of $300 per week. (*Id.* at 205:6–13.)

Coch testified that when he was appointed Captain, "the vessel had apparently sat for quite a while in one place and was in a great state of disrepair. On a daily basis, I spent many hours with my crew trying to get the boat into a seaworthy position where it could be sold for the bank." (*Id.* at 195:2–6.) Among the repair and maintenance issues Coch encountered on the Louise was an ongoing problem with the yacht's computer system, called the Lantic system. (*Id.* at 197:3–8; Glass Tr. Testimony at 254:5–8.) The Lantic software system was used to operate the yacht's controls for its variety of operating systems. (Glass Tr. Testimony at 254:22–23.) According to Glass,

> The Lantic system is a computer-based program ... that takes input from signals from whatever it is that you want to monitor or control. This particular boat had software that ... did the music and entertainment portion as well as the ship's system of fuel tankage, water tankage, engine monitoring and et cetera.

(*Id.* at 255:13–18.)

Mann testified that the Lantic system was a "highly sophisticated electronic system," but that it was not so complicated that he could not operate it. (Mann Tr. Testimony at 344:21–345:5.) Coch testified that, when he took the Louise on a particular sea trial, "the Lantic system shut down entirely, at which point all I had to navigate and run the boat by were the engines and controls themselves." (Coch Tr. Testimony at 197:3–8.) Coch testified that the Lantic system was the main problem he encountered with the Louise and that "most of my problems and most of my concerns and the better part of my day was spent dealing with that system." (*Id.* at 197:23–25.) The Lantic system was

never repaired to Coch's satisfaction prior to the Louise's sale. (*Id.* at 200:4–8.) Before his work with the Louise, Coch had never dealt with another boat featuring the Lantic system. (*Id.* at 216:25–217:2.) Glass similarly testified that the Roscioli boatyard specialized in the manufacture of a different yacht, the Donzi, and that Roscioli had not previously dealt with either the Lantic software or the type of surface-piercing propulsion system used by the Louise. (Glass Tr. Testimony at 293:1–294:23.)

Mr. Coch testified that he did not receive any special training to operate the Louise and its complex or unique systems. (Coch Tr. Testimony at 221:24–222:1.) Coch also encountered a number of other problems with the Louise, including propellers requiring modifications and removal of crustaceans, the hydraulic system that controlled the steering leaking and failing to operate, the loss of an engine, and the corrosion of air conditioning compressors. (*Id.* at 199:15–200:25, 201:9–17, 201:23–25, 204:6–19.) Coch testified that he has never "come across a boat since [his work on the Louise] or before [his work on the Louise] that had the problems and complication that I experienced with [the Louise]." (*Id.* at 216:20–22.)

Glass testified that he also inspected the Louise "[w]hen the vessel first came to [Roscioli]." (Glass Tr. Testimony at 252:18.) He noted upon his inspection that the yacht had "nice accommodations," including a VIP stateroom, two guest staterooms, a master stateroom, a wheelhouse, and a lounge with a bar. (*Id.* at 253:3–11.) Glass testified that the Louise was a "European style vessel[ ] where you board over the transom." (*Id.* at 253:13–14.) Glass also testified that the Louise lacked a formal dining room, which in his opinion would negatively affect its marketability. (*Id.* at 253:21–24.)

Waterside was promised a sales commission equal to 40 percent of 10 percent of the unadjusted sales price of the Louise. (Samalik Tr. Testimony at 164:3–7.) Although Waterside was a corporate arm of Roscioli, and although Comerica was paying Roscioli for dockage and repairs while the Louise was housed at the Roscioli shipyard, Waterside did not have a conflict of interest that prevented it from marketing the Louise effectively. Due to the nature of Comerica's central listing agreement with Waterside, other brokers aside from Waterside were permitted to list the Louise for sale and to contact Waterside on behalf of interested buyers. (*Id.* at 101:4–7.) Indeed, Comerica received a number of offers for the Louise from other brokers on behalf of prospective buyers. While the evidence indicates that Waterside's marketing efforts were restricted in scope, there was no evidence that Waterside sabotaged the sales offers made through other brokers.

*ii. Marketing and advertising efforts*

Samalik testified that Comerica marketed the Louise for sale prior to making needed repairs recommended in the marine surveys and "the yacht did not sell because when it went out to sea trial, systems failed and the buyer walked away."[16] (Samalik Tr. Testimony at 58:1–8, 61:1–6, 73:5–11, 77:4–6, 107:16–17 ("So, the nature of the yacht, as well as the maintenance issues to repair things, were a deterrent to sell this yacht.").) Mattingly testified that Waterside handled the marketing of the Louise improperly and in his opinion he would not take a boat with the types of problems suffered by the Louise, including the inoperable Lantic system, on sea trial with prospective purchasers. (Mattingly Tr. Testimony at 534:21–537:14.) According to Mattingly, Comerica should have first repaired the problems identified in the marine surveys, including the operation issues involving Lantic system, prior to showing the boat to prospective purchasers. (*Id.*) Eventually, Comerica undertook the expense of making the necessary repairs to get the Louise in working order for sale, including a "patch" for the Lantic System.[17] (Samalik Tr. Testimony at 77:7–16, 103:13–104:4, 107:18–108:16.)

However, according to Coch, due to what he termed the Louise's myriad repair and performance issues, Waterside did not begin actively marketing the Louise until approximately seven or eight months before it sold, when necessary repairs could be made. (Coch Tr. Testimony at 204:22–205:1; Glass Tr. Testimony at 267:17.) Coch's recall of the date sequence and explanation for the delay in marketing and repairs are not entirely correct. Although Comerica did not take actual possession of the Louise until May 21, 2009, the record reveals that Comerica was intimately involved with the Louise beginning in November 2008 and at very minimum, prepared to proceed with its sale. Comerica was aware of the Louise's repair and performance issues at that time—indeed, Comerica, along with Mann, was involved in discussions with Royal Denship to complete warranty repairs on the Louise as of late 2008. As Comerica was aware of these issues in late 2008 and Royal Den-

---

**16.** These repairs included the faulty Lantic system. (Samalik Tr. Testimony at 58:1–8, 61:1–6, 73:5–11.)

**17.** Indeed, the Louise was fully operable in August 2010 when Comerica representatives took their family members on a trip to the Bahamas. Mr. Glass, a representative from

Comerica, Crystal Beastrom–Diaz and her husband, along with a different captain hired for the trip, took a trip on the Louise in August 2010 to the Bahamas. (Coch Tr. Testimony at 226:20–22; Glass Tr. Testimony at 317:18–319:11.)

ship's incapacity to perform warranty repairs was evident by early February 2009, Comerica's delay in its handling of the Louise did not make complete business sense. In sum, Comerica had announced its decision to pursue all remedies, including sale, of the Louise in November 2008; knew that Royal Denship would not honor its warranty obligation by February 2009; liquidated Mann's $250,000.00 CD in April 2009; announced anew its intent to pursue all remedies and take possession in May 2009; but was not prepared to take the predicate steps to prepare the boat for marketing until approximately July 2009 and the boat was not fully operable and ready for actual sale until approximately April 2010, based on Mr. Coch's own calculations.

When Comerica and Waterside finally began marketing the Louise, Waterside did most of its marketing on the internet. (Coch Tr. Testimony at 205:3.) Specifically, Waterside placed advertisements for the Louise online and prepared "e-mail blasts to notify other brokerage houses" in Florida and a few abroad that the Louise was for sale. (Glass Tr. Testimony at 259:2–3; 304.)

Aside from this internet marketing, Waterside also featured the Louise in the annual Fort Lauderdale Boat Show, "the largest in-water boat show in the world." [18] (Glass Tr. Testimony at 241:2–6.) According to Glass, Waterside elected not to feature the Louise in "more than a few boat shows" because prospective customers at boat shows often want to take their desired yachts on sea trial and Coch did not believe the Louise was safe for sea trial at the time the boat shows were scheduled. (Id. at 206:1–9.) Additionally, Coch placed "a couple" of ads for the Louise in the *Wall Street Journal* and in a magazine

called *Power and Motoryacht.* (Coch Tr. Testimony at 205:16–18.) Coch also advertised the Louise for sale on "broker boards[,] which are boards that display boats for sale in my office. When people came in they could see them, as well as bringing [sic] them to boat shows." (Id. at 205:19–21.) Coch explained that even if the Louise were not at a particular boat show, he displayed his broker's board at the show so that attendees could see what he had for sale. (Id. at 205:21–24.) If a buyer expressed interest, he had brochures on hand with more information about the vessels for sale. (Id. at 205:24–25.) Finally, as part of its marketing strategy, Waterside also invited other brokers to make offers for the Louise through Waterside to Comerica. (Id. at 206:24–207:3.)

In conjunction with Comerica, Waterside decided to advertise the Louise as a "bank repo." (Stip. Facts ¶ 17.) Samalik testified that Waterside recommended such an advertisement because it thought the words "would attract more attention because we were not getting offers." (Samalik Tr. Testimony at 155:8–9.) Coch also testified that advertising a yacht as a "bank repo" "motivates some people to believe that they're going to get a bargain." (Coch Tr. Testimony at 207:18–20.) Samalik testified likewise that advertising the Louise as a "bank repo" would cause people to think "here's an opportunity for me to get involved in something that is at a lower price." (Samalik Tr. Testimony at 105:2–4.)

Mann argues that Comerica's decision to advertise the Louise as a "bank repo" artificially depressed the purchase offers Comerica received for the Louise. Mattingly testified that, in his experience, ad-

---

**18.** However, Glass testified that, in his experience, most yacht sales do not occur as a direct result of boat shows. (Glass Tr. Testimony at 241:13–18.)

vertising a vessel as a "bank repo" makes a potential buyer think that "the bank wants to just get rid of it." (Mattingly Tr. Testimony at 506:25–506:1.) Although there is no evidence in the record to suggest that a particular potential buyer made a lowball offer due to the Louise's "bank repo" status, it is reasonable to conclude, as the Court does here, that Comerica's decision to advertise the Louise as a "bank repo" attracted lower offers than it would have otherwise. As Mattingly testified, potential buyers viewing a "bank repo" advertisement would likely assume that the bank hoped to get rid of its asset, and that the bank would therefore accept a lower price for the asset than the asset was worth. Additionally, while the "bank repo" advertising might have attracted some cost-conscious buyers, it might also reasonably have flagged the boat as undesirable for other potential buyers

As the licensed broker assigned to the Louise account, Glass did not contact any brokers outside the United States. (Glass Tr. Testimony at 304:15–17.) Moreover, Waterside did not target its marketing of the Louise to a European market. (Coch Tr. Testimony at 220:9.) Yet, the Louise was more appealing to European buyers because of its style, European manufacture, and the relatively higher value of the Euro in 2009–2010. (Mattingly Tr. Testimony at 503:4–11, 584:23–585:24.) Mattingly testified that "there are a number of brokerage houses in the Florida area that have foreign outlets." (Mattingly Tr. Testimony at 585:5–15.) While the American market was not familiar with this particular Royal Denship yacht (Royal Denship had struck a deal with Mann so that it could promote its product in the United States market), (Mann Tr. Testimony at 395:17–22, 396:22–25), similar yachts had been successfully marketed in Europe. (Mattingly Tr. Testimony at 492:15–496:7, 521:12–13, 523:14–16.) According to Sa-

malik, Comerica decided against taking the Louise to market in Europe because the bank was concerned both that the yacht would not make it to Europe on its own bottom and that the cost of taking the boat to Europe would be prohibitive. (Samalik Tr. Testimony at 106:11–15; Glass Tr. Testimony at 267:23–24 (testifying that the Louise would not have made it to Europe on its own bottom "even with the repairs").) Samalik's reasoning here seems to reflect her lack of commercial experience in the yacht arena more than anything else. The Louise was in the first place shipped to the United States. Boats of the Louise's size typically are shipped across the ocean. (Glass Tr. Testimony at 265:23–266:3; Coch Tr. Testimony at 222:5–14.) Glass testified that Waterside similarly could have shipped the Louise to Europe on the deck of another boat. (Glass Tr. Testimony at 267:23–268:2.) In fact, Glass testified that Waterside has shipped vessels in this manner to the Mediterranean, at a cost of "around $150,000 over *and then back.*" (*Id.* at 268:5–6.) Given that Comerica was receiving offers for the Louise in the range of $2,000,000.00, shipping the Louise to Europe, where the yacht appeared to command a far stronger market and customer appeal, would have been completely commercially reasonable.

According to Samalik, even without targeting an advertising campaign to Europe, Comerica "had people from all over the world that were looking at this boat" due to its listing on the internet. (Samalik Tr. Testimony at 106:21–24.) However, Samalik provided no evidence to support her claim that the listing was viewed by an international audience—the fact that Waterside advertised the Louise on the internet is not dispositive of the reach of Waterside's marketing efforts. For example, beyond the few *non-European* internation-

al customers who personally inspected the Louise, (*see infra* pp. 1280–82), there is no evidence in the record that Roscioli's Internet posting and email blast were reasonably designed to target a European market or were effective in securing an international, much less any European, customer interest. Based on totality of evidence presented, the Court cannot find that the bank took reasonable measures to market the Louise to the European market, which at that time was stronger particularly for a yacht of the Louise's design and manufacture.

### iii. Offers for the Louise

Between December 2009 and December 2010, the highest offer Comerica and Waterside received for the Louise was $2,400,000.00. (Coch Tr. Testimony at 210:24–25.) In December 2009, Comerica received an offer from Arturo Gamboa to purchase the Louise for $2,000,000.00. (Samalik Tr. Testimony at 83:23–24.) On January 12, 2010, Comerica received an offer from Konig International for $1,700,000.00. (*Id.* at 85:22–86:3.) On February 12, 2010, Comerica received a $2,100,000.00 offer from Paul Maggori on behalf of Evanna Marina. (*Id.* at 86:4–12.) At some point between 2009 and 2010,[19] a company called Lazarides Yachts presented Comerica with an offer on behalf of Peter Ferrari, from Australia, for $2,300,000.00. (*Id.*) On April 13, 2010, Comerica received an offer for $2,000,000.00 from a Mr. Rebeil from California. (*Id.* at 88:16–18.) Mr. Rebeil requested financing for his purchase, and following negotiations with Comerica over this point, made a second offer at a later date. (*Id.* at 88:20–24.) On April 30, 2010, Comerica received an offer from Blue Playdoh, LLC for $2,100,000.00. (*Id.* at 89:13–14.) On July 13, 2010, Comerica received an offer from Diego Roa for $2,400,000.00, with a requested reduction in price of $150,000.00 for maintenance and repair. (*Id.* at 89:16–20.)

Coch testified that written counter-offers were made on behalf of Comerica in response to only two or three bids. (Coch Tr. Testimony at 221:18–21.) However, Samalik testified that all prospective buyers who made offers and actually took the Louise on sea trial elected not to purchase the yacht because, at sea trial, the yacht did not perform correctly. (*Id.* at 79:1–3.) According to Samalik, the yacht would either run too slow or too fast, and the yacht's navigation system was too complex for some of the buyers. (*Id.* at 79:3–5.) Another prospective buyer flew in from California but "didn't even want to [go to] sea trial [on the Louise]. He looked at the complexity of the computer system and what it took to run it. Everything was very technical on the yacht, and it—it was overwhelming to him and he left." (*Id.* at 78:22–25.)

Coch testified that, on one sea trial with a prospective buyer, Mr. Maggori, the Louise's hydraulic system lost power and the crew therefore lost steering. (Coch Tr. Testimony at 203:21–204:5; 208:13–20.) Even after Maggori rejected the Louise after this first sea trial, he agreed to reconsider his decision after Coch repaired a number of the issues Maggori and his surveyor had identified. (*Id.* at 208:21–24.) However, on a second sea trial with Maggori aboard, one of the Louise's engines died and the yacht, under Coch's navigation, bumped against the dock and bent the yacht's railing. (*Id.* at 208:24–209:2.) Maggori subsequently decided against purchasing the Louise. (*Id.* at 209:3–6.)

Coch took other prospective buyers on the Louise and on sea trials, with similar results. For example, Lazarides Yachts

---

**19.** Samalik's testimony does not indicate the date on which this offer was made.

International, the firm representing the Australian buyer, brought a number of clients to see the Louise. (*Id.* at 209:15–19.) The clients asked Coch "to demonstrate various options on the boat. And the boat did not perform at the dock, so we never went to a sea trial." (*Id.* at 209:20–22.) Among the problems with the yacht that day, the power moon roof did not work, the entertainment system did not operate, "[a]nd the client just felt that we were not prepared to show him the boat." (*Id.* at 209:23–210:1.) In another example, Coch took a prospective buyer representing the Jim Earle Marine Group on a sea trial. (*Id.* at 210:2–5.) On this sea trial, too, the buyer "wasn't happy with the performance of the boat, even though the boat that day was running quite well." (*Id.* at 210:5–7.) Coch viewed these operational problems as primarily linked to the Lantic computer system's functioning, which Roscioli's boatyard still had not been able to fully address or remedy. (*Id.* at 196:22–197:25.) The record is insufficient to draw a firm conclusion as to whether Coch's lack of training with the specific features and systems of this yacht might also have contributed to the yacht's performance difficulties when shown.

Between November 2008 and December 2010, Comerica paid Roscioli $117,659.59 in dockage fees and $346,962.63 in maintenance and repair fees. (Pl.'s Exs. 7, 8.) Throughout the period of its marketing by Waterside, the Louise was stored at Roscioli Yachting Center. (Samalik Tr. Testimony at 97:4–14.) The yacht was docked undercover, along with yachts from other brokerage firms. (Glass Tr. Testimony at 242:4–9.) The shipyard was not open to the public—a potential buyer was required to have an appointment or know someone at Roscioli to gain access and inspect the Louise. (Coch Tr. Testimony at 224:7–13.)

### iv. Sale of the Louise

In December 2010, Comerica struck a deal to sell the Louise to XSMG North America, Ltd. ("XSMG"), a Cayman Island Corporation, for $1,400,000.00. (*Id.* at 297:10–15; Stip. Facts ¶ 23.) XSMG was represented by a man named Robert Sanchez. (Coch Tr. Testimony at 219:21–24.) When Mr. Sanchez made his offer to purchase the Louise, Coch recommended that Comerica reject his offer. (*Id.* at 220:3–5; 231:9–13.) The offer "wasn't close to what we were asking for the boat, and I knew that Mr. Sanchez was going to really try to discount the boat further than his original offer." (*Id.* at 231:9–13.) Coch also testified that Mr. Sanchez acted in a threatening manner toward Roscioli in the context of negotiations over his purchase of the Louise, stating that Mr. Sanchez "was a pretty violent person." (*Id.* at 223:12–18.)

According to Mattingly, Mann's expert, the fair market value of the Louise at the time of her sale to XSMG was between $3,500,000.00 and $3,700,000.00. (Mattingly Tr. Testimony at 497:2–5.) Mattingly testified that he arrived at this estimate of value based on an analysis of comparable boat sales along with a dollars-per-pound-of-displacement calculation.[20] (*Id.* at 497:6–9.) By contrast, Glass testified that it was fortunate that the boat sold at all but acknowledged he had no knowledge of the different independent surveys' assessments of the Louise's value. (Glass Tr. Testimony at 289:14–15; 311:18–20.)[21] On

---

20. The Louise sold to XSMG at approximately $12 per pound, but Mattingly testified that the price should have been between $47 and $52 per pound. (Mattingly Tr. Testimony at 498:3–7.)

21. The Court finds Glass' testimony regarding the scope of his knowledge of the Louise's value and relative assets or deficiencies to be inflated. Glass' lack of familiarity with the independent surveys of the Louise was notable since he was designated as the licensed

the other hand, Coch acknowledged that when arrangements were made for Waterside's listing of the Louise in July 2009, boats similar to the Louise were selling for more than $3.5 million and that the $3.5 million sales figure listed for the Louise reflected a discount for being a bank repo. (Coch Tr. Testimony at 222:5–20.) No doubt this was also a significant part of his recommendation that Waterside reject the $1.4 million bid as insufficient.

The sale of the Louise occurred in the Bahamas at the request of the buyer, Mr. Sanchez. (Coch Tr. Testimony at 192:4–11, 232:16–21; Glass Tr. Testimony at 299:7–21.) Captain Coch sailed the Louise to the Bahamas to deliver it for sale. (*Id.* at 231:17, 232:16–21.)

*v. Letter of no-objection from Campbells*

On December 17, 2010, Campbells wrote a letter to the Registrar of Ships at the Cayman Islands Shipping Registry at the request of Comerica. (Letter from Sylvia Howie to the Registrar of Ships, Dec. 17, 2010, Pl.'s Ex. 4 tab 15, ("Campbells Letter").) Sylvia Howie, a Campbells representative, wrote that Campbells provided the registered office for Yacht Ventures and stated further that she had "no objection to the sale, transfer and/or deletion of [the Louise] from its current registry at the port of George Town." (*Id.*)

Mann testified that Campbells was a registered agent for Yacht Ventures in the Cayman Islands. (Mann Tr. Testimony at 414:21–415:1.) He testified that Campbells was not Yacht Ventures' attorney "per se," (*id.* at 415:2–12), that he never received any legal advice from Campbells, and that neither he personally nor Yacht Ventures

had ever received or paid Campbells for any legal services rendered (*id.* at 418:4–8). He also testified that he had not seen the letter from Ms. Howie until the commencement of the present lawsuit, that he had not authorized the letter, and that he only learned in January 2011 that the Louise had been sold. (*Id.* at 413:18–415:14.) There is no evidence in the record that the letter was copied or provided to Mann. Based on this evidence, Mann therefore argues that Campbells was not authorized to approve the sale of the Louise on his or Yacht Ventures' behalf.

As reflected in Campbells' invoices in evidence, Campbells drafted its December 17, 2010 letter at the behest of Comerica, not of Mann or Yacht Ventures. This finding is reinforced by the billing arrangements reflected in conjunction with the correspondence. For example, on November 30, 2012, Campbells sent an invoice to Gregory McLaughlin, Comerica's attorney at Tripp Scott, for the fees Campbells incurred in sending a letter of no objection to the sale of the Louise, among other services. (Campbells Invoice Nov. 30, 2010, Pl.'s Ex. 4 Invoices/Statements tab 3 ("Campbells Invoice") (stating that Campbells was billing Comerica for the December 17, 2010 letter)). These circumstances make clear that Campbells issued the letter at the direction of and as an agent for Comerica when it sent its December 17, 2010 letter.

The only other evidence as to the scope of Campbells' authority to act on Mann's behalf in this case comes from article 2, ¶ 10 of the Mortgage and Deed of Covenants and from Mann's testimony. The

---

broker for the Louise. He claimed to have been present on almost all of the Louise's sea trials, but Coch, who captained the ship and took day to day responsibility for its maintenance and sale, testified that Glass was on board only once or twice for the sea trials.

(Coch Tr. Testimony at 221:16–17; Glass Tr. Testimony at 305:3–7.) Given the small number of individuals who would have been present on any given sea trial and Coch's overall testimony, the Court finds that Coch's testimony was far more credible than Glass's.

Mortgage and Deed of Covenants does not mention Campbells by name. Instead, ¶ 10 provides that, as a Cayman Islands company, Yacht Ventures must maintain a registered office and appoint a resident representative in the Cayman Islands in order to comply with Cayman Islands law. (Deed of Covenants ¶ 10.) Under Cayman law, all overseas companies registered in the Cayman Islands must provide to a Registrar "the names and addresses of some one or more than one person resident in the Islands authorized to accept on its behalf service of process and any notices required to be served on it." Companies Law (2012 Revision) Part IX, § 184(1)(e). The evidence in this case thus suggests that ¶ 10 was included in the Deed of Covenants in order to ensure compliance with this provision of Cayman law.

Mann testified that he appointed Campbells as his representative in the Cayman Islands in order to satisfy ¶ 10 of the mortgage. Mann testified that Campbells served as nothing more than "a post office box and the keeper of the corporate book for the [Louise] which was flagged in the Cayman Islands." (Mann Tr. Testimony at 414:24–415:1.) Neither Mann nor Yacht Ventures ever paid Campbells a retainer to act as Yacht Ventures' attorney, and neither Mann nor Yacht Ventures ever received any legal advice from Campbells. (Id. at 415:9–11.) Prior to drafting the December 17, 2010 letter purportedly authorizing the sale of the Louise, the extent of Campbells' participation in this case involved the collection of Yacht Ventures' Cayman Islands mail and the forwarding of that mail to Mann in the United States. (Id. at 429:21–430:3.) Based on this evidence and the limited role of Yacht Ventures' Cayman Island agent provided under ¶ 10 of the Mortgage and Deed of Covenants and corresponding Cayman law, the Court finds that the scope of Campbells' agency in this case was limited to

accepting service of process and other notices on behalf of Yacht Ventures. In other words, the evidence indicates that Campbells' authority was limited to performing the role of a registered agent as contemplated by Cayman law.

### vi. Consent to sale

As a preliminary matter, Comerica contends that Mann consented to the sale of the Louise when his agent, Campbells, sent a letter of no objection to the Cayman Islands Shipping Registry on December 17, 2010. Comerica contends that it was therefore not required to provide Mann with notice of disposition in this case. (Comerica's Proposed FOF at 26.)

Comerica failed to raise this argument in prior stages of this litigation. Given the centrality of this argument to Comerica's trial position before the Court, Comerica's failure to mention the assertion through summary judgment and its pretrial order submission undermines the credibility or persuasiveness of the argument. Nevertheless, the Court will consider the merits of Comerica's argument here.

 A principal is bound by the statements of its agent made while the agent was acting within the scope of his authority. *Thomkin Corp. v. Miller,* 156 Fla. 388, 24 So.2d 48, 49 (1945); *Am. Lead Pencil Co. v. Wolfe,* 30 Fla. 360, 11 So. 488, 491 (1892); *Banco Santander Puerto Rico v. Select Title Serv. Inc.,* 692 So.2d 950, 952 (Fla.Dist.Ct.App.3d 1997). "The agent's authority may be conferred by writing, by parol [evidence], or it may be inferred from the related facts of the case." *Thomkin Corp.,* 24 So.2d at 49. An agent's conduct is deemed to have been within the scope of his authority even if such conduct is unauthorized, so long as "it is of the same general nature as, or sufficiently similar to, authorized conduct." *Padgett v. Sch. Bd. of Escambia Cnty.,* 395

So.2d 584, 586 (Fla.Dist.Ct.App.1st 1981). "Where there exists any evidence from which a [trier of fact] could conclude that the acts in question were committed by an agent within the scope of his employment, the questions of agency and scope are to be resolved by the [trier of fact]." *Horizon Leasing, A Div. of Horizon Fin., F.A. v. Leefmans,* 568 So.2d 73, 75 (Fla.Dist.Ct. App.4th 1990).

The Court has found as a matter of fact that the scope of Campbells' agency was limited to accepting service of process and other notices on behalf of Yacht Ventures. Campbells' letter of December 17 is therefore insufficient to establish that Mann authorized the sale of the Louise to XSMG and that Comerica was therefore exempt from the requirement to provide Mann with notice prior to sale.[22] The provisions of Cayman law strengthen the Court's determination. The registered agent requirement under Cayman law for a company chartered there is narrow and does not remotely suggest the broad scope of agency that is the predicate for Comerica's contention that Campbells was legally empowered to "consent" to the Louise's sale on behalf of Mattingly or Yacht Ventures. Companies Law (2012 Revision) Part IX, § 184(1)(e).

#### vii. Notice

 Even if Mann did not expressly authorize the sale of the Louise, Comerica contends that it provided Mann with proper notice prior to the yacht's disposition in satisfaction of Florida law.[23] "Notice is an integral aspect of whether the disposition [of collateral] is 'commercially

reasonable' under chapter 679." *Landmark First Nat'l Bank of Fort Lauderdale v. Gepetto's Tale O' the Whale of Fort Lauderdale, Inc.,* 498 So.2d 920, 922 (Fla. 1986).

Section 679.613 of the Florida Statutes provides that prior to disposition of collateral, a secured party must give the debtor notice of the intended disposition. Under § 679.613,

(1) [t]he contents of a notification of disposition are sufficient if the notification

 (a) Describes the debtor and the secured party;

 (b) Describes the collateral that is the subject of the intended disposition;

 (c) States the method of intended disposition;

 (d) States that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and

 (e) States the time and place of a public disposition or the time after which any other disposition is to be made.

(2) Whether the contents of a notification that lacks any of the information specified in subsection (1) are nevertheless sufficient is a question of fact.

*Id.* § 679.613; *see also Landmark First Nat'l Bank of Ft. Lauderdale v. Gepetto's Tale O' the Whale of Ft. Lauderdale, Inc.,* 498 So.2d 920, 922 (Fla.1986) (holding that a notice of disposition must specify whether the intended sale is to be public or private); *Jackson v. Southern Auto Fin.*

---

**22.** There is likewise no indication that Mann consented to the sale by abandoning the yacht. Comerica and Mann were involved in ongoing negotiations in 2008 and 2009, and the evidence indicates that Mann allowed Comerica to take control over the yacht in order to more efficiently resolve his debt.

**23.** Comerica analyzes the notice issue under Florida law and Cayman law. Due to the Court's conclusion regarding the applicable law in this matter, the Court will only consider whether Mann received notice of disposition under Florida law.

*Co.*, 988 So.2d 721, 722 (Fla.Dist.Ct.App. 2008) (holding that a notice of disposition provided by lender was insufficient under the current Florida notice statute because the notice "failed to include a number of requirements found in [the statute], such as whether the sale was public or private").

██ Comerica contends that it expressly provided written notice of disposition, as required under Fla. Stat. Ann. § 679.613, either in McLaughlin's May 21, 2009 or November 14, 2008 correspondence to Mann. Comerica is incorrect. McLaughlin's May 21, 2009 letter failed:

- to specify the method of intended disposition;

- to state that Yacht Ventures was entitled to an accounting of its unpaid indebtedness and the charge for such accounting;

- to state whether the sale would be private or public;

- to state the time and place of the disposition or the time after which a private disposition was to be made; and

- to identify the liquidated CD as Comerica's collateral.

Accordingly, the May 21, 2009 letter failed to comply with the requirements of subsections (c)–(e) of Fla. Stat. Ann. § 679.613(1). *See, e.g., Jackson*, 988 So.2d at 722. Furthermore, the May 21, 2009 letter was written more than one month *after* Comerica disposed of the $250,000.00 CD. The letter could not have served of notice of disposition of collateral after part of that collateral had already been liquidated.

██ Even if the May 21, 2009 letter did not comply with the requirements of Fla. Stat. Ann. § 679.613(1), Comerica argues that McLaughlin's November 14, 2008 letter satisfied the Florida notice re-

quirements. Acknowledging that the November 14, 2008 letter also failed to meet the exact requirements of § 679.613(1), Comerica argues that the letter nevertheless provided sufficient notice because "[s]pecific notice of the sale, including the exact time of the sale, is not necessary in private sales." (Comerica's Proposed Findings of Fact and Conclusions of Law at 29 (quoting *Sorrels v. Rebecca's Ice Cream, Inc.*, 696 S.2d 1313, 1315 (Fla.Dist. Ct.App.2d 1997)).). Under Fla. Stat. Ann. § 679.613(3),

> The contents of a notification providing substantially the information specified in subsection (1) are sufficient, even if the notification includes:
>
> (a) Information not specified by that paragraph; or
>
> (b) Minor errors that are not seriously misleading.

*Id.* at § 679.613(3).

Comerica's argument here, too, is a nonstarter. Comerica relies on *Sorrels* for the proposition that specific notice of sale in line with the requirements of § 679.613 is not necessary in private sales. *Sorrels*, in turn, relied on *Bondurant v. Beard Equipment Co.*, 345 So.2d 806 (Fla.Dist.Ct. App.1st 1977) for the same proposition. However, the District Court of Appeal of Florida in *Jackson* made clear that *Bondurant* is no longer good law, having been decided "before the legislature enacted the current statutes requiring written notice." *Jackson*, 988 So.2d at 722 (referencing the amendment of what was previously Fla. Stat. Ann. § 679.504 to track the current provisions of UCC § 9–613). Accordingly, Comerica's reliance on *Sorrels* as authority to diminish the written notice requirements of § 679.613 is misplaced. Furthermore, the errors contained in each of McLaughlin's letters are not "minor." On the contrary, both letters omitted substan-

tial pieces of information regarding the manner of disposition, the entitlement to an accounting of unpaid indebtedness, identification of the CD as collateral, whether the sale would be public or private, and the time after which a private disposition would take place. Comerica therefore failed to supply Mann with written notice of disposition under Florida law that substantially conformed with Fla. Stat. Ann. § 679.613.

Comerica makes a final argument that, even if its written notice of disposition was insufficient, Mann received actual notice of disposition, "which suffices." (Comerica's FOF at 32 (citing *Sorrels*, 696 So.2d at 1314).) Comerica contends that "[t]he continued interactions between Mr. Mann's attorneys and Comerica's attorneys prior to Comerica's taking notice [sic] reflected that [Mann] expected Comerica to dispose of the Yacht." (*Id.*) Comerica also points to Fla. Stat. Ann § 671.201(25), which provides that a person has "notice" of a fact if the person:

(a) Has actual knowledge of it;

(b) Has received a notice or notification of it; or

(c) From all the facts and circumstances known to the person at the time in question, has reason to know that it exists. A person "knows" or has "knowledge" of a fact when the person has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refer to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this section.

*Id.*

The law on which Comerica relies here is inapposite. First, as *Jackson* made clear and as the Court has already noted, *Sorrels* is no longer good law insofar as it stands for the proposition that actual notice of sale alone is sufficient under § 679.613. *Jackson* is explicit that, since the Florida statute was amended to track UCC § 9–613, actual notice is insufficient where written notice fails to meet the substantive requirements of § 679.613(1). *Jackson*, 988 So.2d at 722. Second, Comerica's reliance on § 671.201 is misplaced. That section makes clear that its definitions, including its definition of "notice," apply "[u]nless the context otherwise requires." In the context of a secured creditor's disposition of collateral, the notice requirements of § 679.613 clearly apply. Any reading of § 679.201 to provide that the notice requirements of that section override the requirements of § 679.613 would deprive § 679.613 of all its meaning. Section 679.201 therefore cannot be read in this way. *Hawkins v. Ford Motor Co.*, 748 So.2d 993, 1000 (Fla.1999) ("We are compelled by well-established norms of statutory construction to choose that interpretation of statutes and rules which renders their provisions meaningful." (quoting *Johnson v. Feder*, 485 So.2d 409, 411 (Fla. 1986))).

■ Even if the contents of Comerica's two pieces of written "notice" did not comply with the provisions of § 679.613(1), the Court is still authorized under § 679.613(2) to find as a matter of fact that the contents of Comerica's notice were sufficient. Based on the evidence, however, the Court finds that Comerica's November 2008 and May 2009 letters did not place Mann on proper notice regarding critical elements relating to the Louise's sale or disposition. First, as of November 2008, even Comerica was unsure as to how the Louise would be disposed. Samalik, Comerica's representative, testified that, beginning in December 2008, Comerica was open to the possibility that Royal Denship would take back the Louise, and that Comerica would

not have to put the yacht on the market. (Samalik Tr. Testimony at 67:25–68:3.) Only after Comerica learned that Royal Denship had gone bankrupt, in April 2009, did Comerica decide that it would try to sell the Louise on its own. (*Id.* at 77:7–15.) Comerica cannot therefore argue in good faith that its November 2008 letter provided sufficient notification of disposition when Comerica was still unsure when it sent the purported notice of how the Louise would be disposed.[24]

Second, the May 21, 2009 letter merely stated that Comerica would be taking possession of the Louise. The letter mentioned Comerica's rights under the Deed of Covenants, including the right to collect all expenses related to the sale of the Louise, but made no mention of any specific plans to dispose of the Louise or any date after which such a disposition may have taken place or whether a sale would be public or private. (May 21, 2009 Letter.) The letter put Mann on notice of nothing beyond the fact that Comerica was electing to take possession of the Louise, and omitted vital information about Comerica's plans to dispose of its collateral.

The Court therefore finds that neither Comerica's November 2008 letter nor its May 2009 letter to Mann constituted sufficient notice before disposition of collateral under Florida law. The Florida notice statute states that notice of disposition must contain "substantially the information specified in subsection (1) [of § 679.613]." Fla. Stat. Ann. § 679.613(3). Neither of Comerica's letters to Mann "substantially" provided him with such information. Under Florida law, Comerica was permitted to provide information in its notice of disposition that varied from the content prescribed under § 679.613. How-

ever, Comerica was still required to provide "substantially" the same information as prescribed under the statute. In this case, Comerica's omission regarding the nature of the intended disposition constituted a major omission under Florida law, as did its omission regarding whether or how it actually intended to sell the Louise. Even given the statute's allowance for variance, Comerica therefore failed to provide sufficient notice of disposition under the requirements of Florida law.

*viii. Commercial reasonableness of sale*

 The existence of commercial reasonableness is a question of fact. *Burley v. Gelco Corp.,* 976 So.2d 97, 100 (Fla.Dist. Ct.App.2008). If notice or other aspects of the sale are found to have been deficient under the statute, a rebuttable presumption arises that the sale of the collateral at issue was commercially unreasonable, and that the fair market value of the collateral at the time of the repossession was equal to the total secured debt. *Id.; Weiner,* 482 So.2d at 1364; *Gangelhoff v. Transamerica Comm. Fin. Corp.,* 611 So.2d 1333, 1334 (Fla.Dist.Ct.App.1993). The secured party may overcome this presumption by showing that the amount actually received at the sale was equal to the fair market value of the collateral at the time of repossession and that the proceeds of the sale were less than the debt. *Gangelhoff v. Transamerica Comm. Fin. Corp.,* 611 So.2d at 1334; *Weiner,* 482 So.2d at 1365; *Burley,* 976 So.2d at 100–01 (analyzing the manner in which the collateral was sold after establishing that notice was deficient).

Commercial reasonableness is defined as a disposition "in conformity with reasonable commercial practices among dealers

---

**24.** The November 2008 letter also completely omitted reference to the $250,000 CD that the bank liquidated in April 2009.

in the type of property that was the subject of the disposition." Fla. Stat. Ann. § 679.627(2)(c); *see also Gepetto's Tale O' the Whale of Fort Lauderdale, Inc.*, 498 So.2d at 922; *S. Developers & Earthmoving Inc. v. Caterpillar Fin. Serv. Corp.*, 56 So.3d 56, 61 (Fla.Dist.Ct.App.2d 2011); *Textron Fin. Corp. v. Lentine Marine, Inc.*, 630 F.Supp.2d 1352, 1358–59 (S.D.Fla.2009). The existence of commercial reasonableness is a question of fact. *Burley*, 976 So.2d at 100. Where a debtor places in issue the commercial reasonableness of a secured party's disposition of collateral, the secured party bears the "burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part." Fla. Stat. Ann. § 679.626(2); *Burley*, 976 So.2d at 100; *Textron Fin. Corp.*, 630 F.Supp.2d at 1358. As the *Burley* Court noted, the rules on commercial reasonableness are designed "to protect the debtor, because they help prevent the creditor from acquiring the collateral at less than its true value or unfairly understating its value so as to obtain an excessive deficiency judgment." *Burley*, 976 So.2d at 100 (citations omitted); *see also S. Developers & Earthmoving, Inc. v. Caterpillar Fin. Servs. Corp.*, 56 So.3d 56, 60 (Fla.Dist.Ct.App.2d 2011).

The Court has already found Comerica's provision of notice was deficient and thus under Florida law, commercially unreasonable. Fla. Stat. Ann. § 679.626(2); *Weiner*, 482 So.2d at 1364; *Burley*, 976 So.2d at 100; *Textron Fin. Corp.*, 630 F.Supp.2d at 1358. Comerica's marketing and sale of the Louise was also commercially unreasonable. First, Comerica sold the Louise to XSMG for $1,400,000.00, a price $300,000.00 lower than the next lowest of-fer Comerica received, and $2,500,000.00 below its listing price. The facts elicited during trial suggest that Roscioli was pressured to sell the Louise at a below-market price by an aggressive and perhaps threatening buyer. (Coch Tr. Testimony at 223:12–18.) Coch, who had been at the forefront of marketing the Louise and getting it up to speed for sea trial, advised against selling the yacht at that price to XSMG, because it was not anywhere close to what Comerica was asking for the Louise. (*Id.* at 220:3–5; 231:9–13.) Second, Waterside did not direct a marketing campaign at European buyers. Mann's expert testified that the Louise was geared toward a European market both because it was built in a European style and because the European yacht market was stronger when the Louise was for sale. (Mattingly Tr. Testimony at 503:4–11, 585:20–23.) Glass concurred that the Louise was designed with this distinctly European style. (Glass Tr. Testimony at 253:3–16, 300:21–23.) Third, Waterside did not engage in a full "direct marketing" campaign for this highly specialized boat. Mann's expert, James Mattingly, testified that direct marketing would entail a variety of reasonable measures under the circumstances: communicating both by internet and personal phone calls with all relevant brokerage houses in Florida and internationally (including ones in the European market); aggressively using the independent marine surveys of the Louise in communications with brokers and customers [25], particularly if the yacht were still manifesting performance issues in sea trials; and holding open houses and boarding the boat in a facility where the boat could easily be shown to prospective purchasers. (*Id.* at 504–506.) Waterside's marketing of the Louise need

---

**25.** As Glass testified he was not aware of the marine surveys, he clearly made no use of them.

not have been perfectly crafted or implemented. However, the Court finds that Waterside and Comerica's minimalist approach to marketing a yacht which had been independently assessed multiple times to have a value in excess of $3 million dollars and their failure to reach out to the most likely European customer base cannot be said to have been in conformity with reasonable commercial practices in the luxury yacht trade under the totality of these circumstances.

### E. Amount of Mann's Remaining Debt Owed

As of the date of the bench trial, Mann's remaining debt owed to Comerica, inclusive of principal, accrued interest, and late charges resulting from Mann's default on the loan was as follows:

| | |
|---|---|
| Loan Principal: | $2,755,163.79 [26] |
| Loan Interest: | 319,083.67 |
| Late Charges: | 12,079.36 |
| **Total Amount of Debt:** | $3,086,326.82 |

(Pl.'s Ex. 8.) If the dockage fees, repair costs, and insurance and taxes paid by Comerica following Mann's default are included, the amount of the remaining debt on the loan would total:

| | |
|---|---|
| Dockage Fees: | $117,659.59 |
| Repairs: | 346,692.63 |
| Insurance and Taxes: | 73,846.99 |
| **Total Amount of Debt:** | $3,624,526.03 |

(Pl.'s Ex. 7, 8.) See Fla. Stat. Ann. § 679.626 (providing that the deficiency may include "the sum of the secured obligation, reasonable expenses, and, to the

extent provided for by agreement and not prohibited by law, attorney's fees").[27]

### F. Value of the Louise on Date of Repossession

The Court has determined that Comerica took possession of the Louise on May 21, 2009. Comerica argues that the Louise should be valued at $1,400,000.00, or the price for which it sold in December 2010, in calculating the deficiency for which Mann is liable.[28] This argument is untenable.[29] The amount of a deficiency judgment to which the secured party is entitled is a question of fact. *Caterpillar Fin. Servs. Corp.*, 56 So.3d 56, 60 (Fla. Dist.Ct.App.2011); *see also Textron Fin. Corp.*, 630 F.Supp.2d at 1360 (denying secured creditor's motion for summary judgment because material facts remained as to correct amount of any existing deficiency). Florida law provides that:

> [W]hen it has been determined that a secured party has disposed of collateral in a commercially unreasonable manner, there will arise a presumption that the fair market value of the collateral *at the time of repossession* was equal to the amount of the total debt that it secured. The burden to prove that the fair market value of the collateral was less than the debt will be upon the secured party. If the secured party meets this burden, he will be allowed to recover a deficiency judgment in an amount equal to the total debt minus the fair market value of the collateral as ultimately determined.

---

**26.** Comerica applied credits for the $250,000 CD, the $1.4 million dollars from the sale of the Louise, and an insurance refund to reduce the amount of principal owed on the loan.

**27.** Although the statute permits the secured party to include attorney's fees in its calculation of a requested deficiency, Comerica did not offer evidence of its attorney's fees for this purpose, but chose to seek attorney's fees as a separate Count/claim for damages.

**28.** Comerica offered no expert testimony itself as to the value of the Louise.

**29.** Comerica's argument is further undermined by the fact that Coch, the Louise's captain, testified that he recommended Comerica reject the sale price as a lowball offer. (Coch Tr. Testimony at 220:3–5, 231:9–13.)

*Weiner v. American Petrofina Marketing, Inc.*, 482 So.2d 1362, 1365 (Fla.1986) (emphasis added); *see also Gepetto's Tale O' the Whale of Fort Lauderdale, Inc.*, 498 So.2d at 922; *Caterpillar Fin. Servs. Corp.*, 56 So.3d at 60; *In re Convention Press, Inc.*, 84 B.R. 232, 234 (Bankr. M.D.Fla.1988). The Court thus cannot confine its analysis of value to the price for which the yacht ultimately sold.

The Court has determined as a matter of fact that Comerica's sales and marketing efforts with respect to the Louise were commercially unreasonable. Thus, the Court cannot look to offers produced by such unreasonable efforts as capturing the complete picture of the Louise's value in the international high-end yacht market or rely on Comerica's likely low-balling of the anticipated sales price through its "repo" advertising of the yacht. In order to rebut the presumption that the fair market value of the collateral was equal to the amount of the debt, Comerica bore the burden of "present[ing] competent proof that the fair market value of the collateral was less than the outstanding balance [of the debt]." *In re Darling*, 207 B.R. 253, 255 (Bankr.M.D.Fla.1997) (citing *Weiner*, 482 So.2d at 1365; *Gepetto's Tale O' the Whale of Fort Lauderdale, Inc.*, 498 So.2d at 922).

In addition to the evidence supplied by Comerica, the Court also has at its disposal the three independent commercially prepared survey assessments of the yacht's value secured by Comerica as well as evidence provided by Defendant Mann through his expert as to the Louise's fair market value. The three independent surveys valued the Louise as follows:

- Pliske Marine, Inc. Survey (May 2008): $5,000,000.00 (May 2008 Survey);
- Patton Marine, Inc. Survey (December 2008): 4,500,000.00 (Dec. 2008 Survey);
- Kelly Marine Surveyors, Inc. Survey (June 2009): $3,275,000.00 (June 2009 Survey).

(Joint Ex. 1; Joint Ex. 2; Joint Ex. 3.) The value assessments provided in each survey took into consideration the costs of any needed repairs on the yacht.

Mattingly, Mann's expert, testified that the Louise was valued between $3,500,000.00 and $3,700,000.00 when it sold in December 2010. (Mattingly Tr. Testimony at 497:2–5.) Mattingly testified that he made his evaluation based on the following information: (1) the three marine surveys performed on the Louise; (2) invoices for repair work performed by Roscioli; (3) copies of depositions taken in this case; (4) conversations with Roger Marshall, a naval architect and the author of "a number of technical books that are kind of used in the maritime industry as basic guidelines;" (5) conversations with the designer of the Louise, Bill Dixon; (6) conversations with various other individuals involved in the yachting industry; (7) price comparisons between the Louise and other similar yachts sold over the four-year time period 2006 to 2010; and (8) price per pound of displacement. (*Id.* at 488:4–489:5.)

In his "price comparison" methodology, Mattingly identified 12 "comparables," or yachts similar to the Louise in terms of size, weight, and engine. (*Id.* at 489:9–14.) Mattingly testified that it is important to compare yachts similar in size, quality, and age in determining fair market value. (*Id.* at 569:18–19.) He further testified that the comparables "were all fiberglass boats. As far as the electronic packages and some of the other components, I didn't get the breakdown of all those, but there—the weight factor would have a lot to do with it. And the prices that they sold for. So, that's indicative of coming up with a comparable price." (*Id.* at 519:4–9.) He also

testified that components such as "big engines, ... generators, ... surface drives" and other types of interior materials would factor into identifying comparables, "but most of the vessels of this nature and this size would be pretty comparable as far as their outfitting would go." (*Id.* at 519:14–20.) Additionally, he testified that the interior finishes of all the boats were the same or comparable, that "the horsepower and price for the engines were about the same," (*id.* at 520:12–13), and that the location of the rudders in comparison to the propellers was the same (*id.* at 520:14–16).

The boats Mattingly identified as comparables included three Royal Denships, three Mangustas, five Sunseekers, and one Pershing. (*Id.* at 492:18–19.) Each boat was 82 feet long. (*Id.* at 492:24.) He testified that he used the Sunseekers as comparables, even though they are a different type/style and less expensive mass-production boat, because they were 82-footers and "the displacement was quite similar," (*Id.* at 566:2–15.).[30] Like the Louise, some of the comparable boats had some hours logged on them when sold. (*Id.* at 522:5–9.) All 12 comparables were sold "used." (*Id.* at 538:24–539:3.) The sales prices for each boat were as follows:

- Group 1 (Average price = $5,563,602.75)
 - Mangusta (2008 model): Sold for $5,077,560.00 [31]
 - Royal Denship (2008 model): Sold for $6,079,710.00 in 2008

- Royal Denship: Sold for $5,779,065 in March 2008 [32]
- Royal Denship (2006 model): Sold for $5,318,076.00 in 2006
- Group 2 (Average price = $3,005,340.00)
 - Sunseeker (2006 model): Sold for $4,100,000.00 in 2008
 - Sunseeker (2006 model): Sold for $3,500,000.00 in 2007
 - Sunseeker: Sold for $2,750,000.00 in 2009
 - Sunseeker: Sold for $2,271,540.00 in 2009
 - Sunseeker: Sold for $2,405,160.00 in 2009
- Group 3 (Average price = $3,494,236.67)
 - Mangusta (2004 model): Sold for $4,000,000.00 in 2006
 - Mangusta: Sold for $2,482,740.00 in 2010
 - Pershing: Sold for $3,999,970.00 in 2010

(Mattingly Tr. Testimony at 492:15–496:7, 544:14–545:20.)

Mattingly devised each of the three groups above based on the similarities between vessels in each group. (Mattingly Tr. Testimony at 495:2–4.) Mattingly testified that the boats in Group 1 were the most similar to the Louise. (*Id.*) Mattingly further testified that "the average [sale price] of all the comparables" was $4,021,059.81.[33] (*Id.* at 496:16–17.)

---

30. Mattingly did however testify that "in most cases, I would say that the buyer for the Sunseeker, is also the buyer for a Royal Denship or Pershing or something like that" and that it generally in the same category of the Louise in terms of size, performance, styling, and fit and finish of the boat. (Mattingly Tr. Testimony at 586:21–587:4.)

31. Mattingly did not indicate in his testimony the date on which the Mangusta sold. However, as the boat was a 2008 model, the sale clearly did not occur in 2006.

32. Mattingly did not testify as to the model year of this yacht.

33. When individually averaged, the average sale price of all 12 comparables is actually

Mattingly testified that the average dollar value of 12 comparables and of the Louise as reported in the three marine surveys was $4,139,696.57. (*Id.* at 496:18–20.) From this last dollar figure, Mattingly subtracted 10 percent to account for depreciation, bringing the average down to $3,725,726.91. (*Id.* at 496:22–24.) Mattingly testified that the 10% depreciation factor accounted "for either the year or maybe some conditional things" and that it was the "rule of thumb" for a standard rate of depreciation in the industry. (Id. at 496:21–23, 523:21–24.) Mattingly then "took it one step further" and applied a 15 percent depreciation (instead of 10 percent) to arrive at a 2010 value of $3,518,742.08. (*Id.* at 496:25–497:1.) On the basis of these calculations, Mattingly arrived at his estimated value for the Louise ranging from $3.5 million to $3.7 million. (*Id.* at 497:2–5.)

Mattingly testified that he confirmed his valuation by use of the price-per-pound valuation methodology. (*Id.* at 497:8–9.) Based on his calculations, two "comparable" Royal Denships sales were between $47 and $52 per pound of displacement. (*Id.* at 497:21–25.) He therefore stated that the Louise should have sold at a rate of $47 to $52 per pound of displacement. (*Id.* at 498:7.) Since the Louise displaced 118,000 pounds of water, Mattingly testified the yacht should have sold for between $5,546,000.00 ($47 × 118,000) and $6,136,000.00 ($52 × 118,000). (*Id.* at 498:8–15.) Mattingly's testimony, however-

er, indicates that he valued the Louise at the time of sale at between $3,500,000.00 and $3,750,000.00. He arrived at this estimate by discounting the average value of 12 comparables and of the Louise as evaluated in three separate marine surveys first by 10 percent and then by 15 percent. Based on his testimony, it therefore appears that Mattingly valued the Louise by exclusive reference to comparable sales prices—the Louise's value according to its price per pound of displacement had no bearing on Mattingly's final analysis.[34]

Mattingly's "comparables" yacht sale analysis, as opposed to his poundage/displacement analysis, is consistent with a normal market value or appraisal analysis performed by an experienced practitioner in a field of specialized consumer goods. Mattingly's specialized experience in the yacht industry and financing and valuation of yachts provided a sufficiently reliable basis for his market value opinion as a whole. However, the Court finds two flaws in Mattingly's analysis. First, Mattingly does not explain how he derived the secondary 15 percent depreciation discount that he applied to assess the Louise's dollar value. Second, Mattingly identified a number of comparables that were sold as early as 2006, approximately three years before Comerica repossessed the Louise and four years prior to the Louise's sale date. The Court finds that boats sold at this early date and before the financial crisis that depressed the yacht market, at least in the United States, may provide

$3,980,318.00. It appears that Mattingly actually averaged together the three group averages to come up with $4,021,059.81. (Mattingly Dep. at 43:10–11.)

**34.** Mattingly's explanation of the foundation for his per pound analysis at trial was insufficiently clear and developed to be helpful to the Court The Court notes however, in reviewing Mattingly's deposition for purpose of ruling on the admissibility of his testimony as

an expert, that Mattingly discussed the basis for his per pound displacement methodology in more detail in his deposition. (*See* Mattingly Dep. at 30–31.) In any event, because Defendant did not adequately explore this methodology during the bench trial, the Court does not rely on Mattingly's per pound analysis in reaching its findings and conclusions as to the Louise's value.

somewhat less guidance in determining the Louise's actual value. (Mattingly Tr. Testimony at 585:19–22 (testifying that "yachts were being sold more in Europe than they were in the U.S." in the time period over which the Louise was being marketed); *see also* Samalik Tr. Testimony at 49:6–13 (testifying that, in 2008, the market for yachts like the Louise had "evaporated").) In addition, the Court is skeptical whether the Sunseekers were actually fully comparable to the Louise for purposes of determining its fair market value as they were mass produced boats.

In the instant case, Comerica bore the burden to prove the value of the collateral both because Mann placed the commercial reasonableness of the sale at issue and because the Court found that sale to be commercially unreasonable. *Weiner*, 482 So.2d at 1365; *Burley*, 976 So.2d at 100; *Textron Fin. Corp.*, 630 F.Supp.2d at 1359–60. However, the Court looks to the totality of the evidence available in this case to assess the likely fair market value of the Louise at the time of its repossession by Comerica, assessing the evidence in the record to determine the proper fair market value for the Louise, without respect to which party carried the burden of proof. Although this evidence does not conclusively establish the Louise's fair market value, or carry Comerica's burden of proof, the Court has assessed Plaintiff's evidence in tandem with evidence produced by Defendant in order to gain a more complete understanding of the Louise's fair market value at the time of its repossession. *Community Bank of Homestead v. Valois*, 570 So.2d 300, 304 (Fla.Dist.Ct.App.3rd 1990) (affirming trial court decision denying deficiency judgment because "there was a sufficient evidentiary basis upon which the trial court could have concluded that the fair market value of the property exceeded the amount of the debt" where the trial court determined that the "bare bones" fair market value of the property was between $186,000 and $216,000 which was "still above the price that the bank sold it for under any possible hypothesis or construction"). The record contains some, albeit incomplete, evidence of the Louise's possible value in the form of three different marine surveys performed in 2008 and 2009, the Louise's 2009 list-price, purchase offers made over the course of 2010, the December 2010 sale price, and Mattingly's comparable yacht sales from 2006 to 2010.

■ As stated above, because the $1.4 million bid price Comerica accepted (and that Coch recommended against) was not a commercially reasonable fair market price, it cannot serve as the basis for determining the fair market value for purposes of a deficiency. *See Textron Fin. Corp.*, 630 F.Supp.2d at 1360 (finding secured party failed to meet its burden of proving fair market value where testimonial evidence offered by secured party that it received fair market value was insufficient to establish that sale price was in fact the fair market value without evidence to support a finding that the sale was commercially reasonable). The July 2009 list price for the Louise was $3,500,000.00. (Central Agency Listing Agreement, Def.'s Ex. 1 ("Listing Agreement"); *see also* Glass Tr. Testimony at 257:21–258:2.) The June 2009 Marine Survey, prepared at Comerica's request immediately after repossession, valued the boat at $3,275,000.00, including the costs of needed repairs. (Joint Ex. 3.) The average valuation provided by the three separately prepared independent marine surveys of the Louise, which took into account the Louise's condition and necessary repairs, as calculated and relied on by Mattingly was $4,258,333.33. The average sale price for all 12 comparable yachts as calculated by Mattingly, including the 2006 yacht sales, was

$4,021,059.81.[35] If the 2006 sales are excluded, the average sale price for the comparables, again using Mattingly's averaging methodology, would be $4,443,400.[36] The average sale price for the three yachts that Mattingly identified as most similar to the Louise that were sold after 2006 is $5,645,445.00. Based on this evidence, the fair market value of the Louise at the time of Comerica's repossession was anywhere from $3,275,000.00 to $5,645,445.00.[37]

As the Court has determined that Comerica failed to dispose of the Louise in a commercially reasonable manner in accordance with Florida's statutory requirements, Comerica bore the burden of proving that the fair market value of the Louise at the time of repossession, not at the time of sale, was less than the debt owed by Mann. Comerica failed to carry its burden of conclusively establishing that the bid price it accepted of $1.4 million in fact was close to the fair market value of the Louise at the time of repossession or that the fair market value of the Louise was less than the total debt owed of $3,624,526.03, including interest, insurance, dockage fees, and repair costs. Comerica produced evidence of the offers it received for the Louise as a result of its marketing efforts. However, those efforts defined the market so narrowly as to create a self-fulfilling, distorted rendering of the Louise's value. The bank's advertisement of the yacht as a "repo" deal further reasonably could have been anticipated to attract low-ball offers. Finally, Captain Coch, Defendant's agent who had been most intimately involved in the sale and maintenance of the Louise, urged Comerica to reject the $1.4 million offer because it was too low and did not fairly reflect the value of the Louise.

Comerica failed to offer any evidence as to the value of the Louise as of the date of its repossession on May 21, 2009. Thus, Comerica has failed to satisfy its burden of rebutting the presumption that the value of the Louise was, at a minimum, equal to the amount of the outstanding debt. *See Caterpillar Fin. Servs. Corp.*, 56 So.3d at 62 (holding that until secured party offered evidence proving that the fair market value of the collateral at the time of repossession was less than the amount of the debt, it was not entitled to a deficiency judgment at all); *Burley v. Gelco Corp.*, 976 So.2d 97, 101 (Fla.Dist.Ct. App.2008) ("Only if [the secured party] can overcome the presumption that the fair market value of the collateral at the time of repossession was equal to the total secured debt would [it] be entitled to a deficiency judgment.") (citing *Weiner*, 482 So.2d 1362); *Gangelhoff*, 611 So.2d at 1334 (holding that under *Weiner*, the secured creditor would only be entitled to a deficiency judgment if it could overcome the presumption by showing that the amount actually received at the sale was equal to the fair market value at the time of repossession and that the proceeds of the sale were less than the debt); *In re Convention Press*, 84 B.R. at 234 (finding that lessor was not entitled to recover deficiency judg-

**35.** As noted above, Mattingly calculated this average, by averaging the three group averages, rather than averaging the 12 comparable sales individually. Using the latter methodology, the average would be $3,980,318.

**36.** Using the individual averaging methodology, the average of the comparables, excluding the 2006 sales, would be $3,844,575.

**37.** Mattingly applied a 10% depreciation to his calculation in order to arrive at a fair market value as of the date of the sale in December 2010 versus the date of repossession in May 2009. As the Court is concerned only with the fair market value of the Louise at time of Comerica's repossession, the Court will not apply Mattingly's 10% depreciation factor in its consideration of the range of possible values of the Louise.

ment where, following sale without prior notification to lessee, lessor presented evidence as to depreciated value and sales price of vehicles, but failed to provide sufficient evidence as to fair market value of the vehicles). Accordingly, the Court finds that Comerica has failed to provide sufficient evidence to support a factual finding by the Court that it is entitled to a deficiency judgment in its favor. Although the Court cannot determine from the record the Louise's exact dollar value, the Court's factual finding precludes Comerica from collecting a deficiency judgment against Mann under the Guaranty for the collateral of the Louise in light of the foregoing authority and factual findings.

## IV. MOTION FOR JUDGMENT AS A MATTER OF LAW

In light of the foregoing findings, the Court **DENIES** Plaintiff's Motion for Judgment as a Matter of Law [Doc. 93]. Plaintiff's requested relief of a deficiency judgment in this matter in connection with the value of the collateral of the Louise is **DENIED** as Plaintiff failed to prove the commercial reasonableness of the yacht's sale and failed to rebut the presumption with sufficient evidence that the fair market value of the collateral securing the debt guaranteed equaled or exceeded the amount of the debt owed.[38]

## V. COMERICA'S CONTRACTUAL ENTITLEMENT TO REASONABLE COSTS, EXPENSES, AND ATTORNEY'S FEES RESULTING FROM MANN'S DEFAULT ON THE GUARANTY

 The refinancing agreement for the Louise consisted of the following docu-

ments, the Promissory Note, the Mortgage and Deed of Covenants, the Guaranty, and the Security Agreement. (Pl.'s Exs. 1–3.) The Promissory Note, the Mortgage and Deed of Covenants, and the Security Agreement contained agreements between Yacht Ventures Ltd. and Comerica Bank, while the Guaranty contained an agreement between Mr. Mann, individually, and Comerica Bank. The Security Agreement, which is incorporated by the Guaranty[39] executed by Mr. Mann, contains a provision entitled "Attorneys' Fees and Other Costs of Collection" that states the following:

> Debtor shall pay all of Bank's reasonable expense actually incurred in enforcing this Agreement and in preserving and liquidating Collateral, including but not limited to, reasonable arbitration, paralegals', attorneys' and experts' fees and expenses, whether incurred with or without the commencement of a suit, trial, arbitration, or administrative proceeding, or in any appellate or bankruptcy proceeding.

(Pl.'s Ex. 3.)

The Eleventh Circuit, interpreting Florida law, construed a similar attorneys' fee provision in a security agreement as a prevailing party provision that would only entitle the creditor to attorneys' fees and costs in enforcing the contract against the debtor if the creditor had won. *In re Martinez,* 416 F.3d 1286, 1288 (11th Cir. 2005); *see also Caterpillar,* 56 So.3d at 62 (reversing final judgment for attorney's

---

**38.** The Court **GRANTS NUNC PRO TUNC** Plaintiff's Motion for Leave to File Excess Pages [Doc. 103]

**39.** The relevant provision of the Guaranty provides that the Guarantor guarantees to the Lender "the prompt and complete payment of all indebtedness, obligations and liabilities of

the Borrower to the Lender ... arising under ... the Deed of Covenants, the Note, this Guaranty and the other documents delivered in connection therewith ... and whether for payment of principal, premium, if any, and/or interest, fees, expenses, or otherwise." (Pl.'s Ex. 9.)

fees in deficiency action based on attorney's fee provision in security agreement, construed as prevailing party fee provision, where creditor failed to rebut presumption that the fair market value was equal to amount of the debt and therefore failed to establish entitlement to deficiency judgment in its favor).

Although Comerica did not prevail on its claim for a deficiency judgment, the Court previously awarded summary judgment in Comerica's favor on Mann's liability for default under the Guaranty. (Doc. 62, Order at 2.) Specifically, the Court found that "under current Florida law, liability for breach of contract has been established as a matter of law based on the statements of material facts as presented by both parties. However, the question of damages as it relates to the disposition of the collateral remains a genuine dispute of material fact." (*Id.*) As Comerica partially prevailed on its claims against Defendant Mann, it is entitled to the reasonable costs and fees associated with the Court's finding of Mann's liability for the default, but not those costs and fees associated with the determination of the commercial reasonableness of the disposition of collateral or the amount of damages/deficiency.

■■■ Paragraph 15 of the Guaranty obligates Mann to reimburse Comerica for the reasonable costs associated with the preservation and liquidation of the Collateral—here the Louise. (Guaranty ¶ 15, Pl.'s Ex. 3.) Comerica presented evidence that it incurred dockage fees in the amount of $117,659.69, repairs and maintenance fees in the amount of $346,692.63, and insurance and taxes in the amount of $73,846.99. (Pl.'s Exs. 7–8.) Despite finding that Comerica's provision of notice and marketing and sales efforts were not commercially reasonable, there is no evidence in the record that Comerica's payment of the dockage fees, repair and maintenance

costs, and insurance and taxes were unnecessary or unreasonable. Accordingly, the Court finds that Defendant Mann is liable under Paragraph 15 of the Security Agreement for these expenses. Comerica is entitled to judgment in its favor on Count I in the amount of $538,199.21.

■■■ The Court further finds that Comerica is entitled to reasonable attorney's fees incurred in its successful prosecution of its claim that Mann was liable for defaulting on his obligations under the Guaranty. The determination of a reasonable attorney's fee is left to the sound discretion of the trial judge after proper application of a lodestar fee analysis. *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Natco, Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1196 (11th Cir.2001) (conducting appellate review of fee award on abuse of discretion basis and applying *Hensley* analysis in private contract dispute where Defendant had partially prevailed); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (11th Cir.1999) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)). Plaintiff, as the party seeking an award of fees here, bears the burden of demonstrating the reasonableness of the attorney hours worked and the rates claimed. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *Norman v. Housing Auth.*, 836 F.2d 1292, 1304 (11th Cir.1988). That burden includes:

supplying the court with specific and detailed evidence from which the court can determine the reasonable hourly rate. Further, fee counsel should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for

each activity.... A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case.

*ACLU of Ga. v. Barnes,* 168 F.3d 423, 427 (11th Cir.1999). In its Proposed Findings of Fact and Conclusions of Law, Comerica indicated that it would submit evidence of its fees and costs following the Court's ruling on the issue of the deficiency. Accordingly, the Court **DIRECTS** Comerica to tailor its request to those hours reasonably related to the portion of the claim on which Comerica succeeded and to provide itemized fee bills consistent with the principles outlined herein.

## VII. CONCLUSION

As set forth herein, Comerica's Motion for Judgment as a Matter of Law [Doc. 93] is **DENIED.** Comerica is not entitled to a deficiency judgment. Defendant Mann is liable under Paragraph 15 of the Security Agreement for these expenses. Accordingly Comerica is entitled to partial judgment in its favor on Count I for Mann's default on the Guaranty in the amount of $538,199.21. In addition, Comerica is entitled to partial judgment in its favor, on Count II for attorney's fees. The Court **ORDERS** Comerica to submit its evidence in support of its request for attorney's fees, as outlined in this Order, within **TWENTY–ONE (21) DAYS** of this Order.